**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD BOYDE,
        *Petitioner-Appellant,*

v.

JILL BROWN, Warden of California
State Prison at San Quentin,*
        *Respondent-Appellee.*

No. 02-99008

D.C. No.
CV-91-02522-WDK

OPINION

Appeal from the United States District Court
for the Central District of California
William D. Keller, District Judge, Presiding

Argued and Submitted
July 15, 2004—Pasadena, California

Filed April 21, 2005

Before: Jerome Farris, Alex Kozinski and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Kozinski

---

*Jill Brown is substituted for her predecessor, Jeanne S. Woodford, as Warden of California State Prison at San Quentin. *See* Fed. R. App. P. 43(c)(2).

**COUNSEL**

Robert E. Darby, Fulbright & Jaworski L.L.P., Los Angeles, California, for the petitioner-appellant.

William M. Wood, Supervising Deputy Attorney General, San Diego, California, for the respondent-appellee.

**OPINION**

KOZINSKI, Circuit Judge:

Richard Boyde was convicted in California state court of robbery, kidnaping for robbery and murder, and sentenced to death. He petitioned the district court for a writ of habeas corpus, challenging his conviction and sentence. The district court denied his petition, and Boyde now appeals.

**Facts[1]**

---

[1]For a more detailed discussion of the facts, see the California Supreme Court's opinion in Boyde's direct appeal, *People* v. *Boyde*, 758 P.2d 25, 27-31 (Cal. 1988).

In early January 1981, Boyde robbed David Baker, an attendant at a Union 76 gas station in Riverside, California. After stealing a small amount of cash and Baker's watch, Boyde forced Baker into Baker's car and ordered him to drive around for several hours. When the car stalled out, Boyde asked Baker to give the police a false description of him and fled on foot.

Ten days later, Boyde robbed a 7-Eleven gas station in Riverside, this time along with his nephew, Carl Franklin Ellison. One of the two men went into the station with a gun and took some money from a cash register, as well as several hats and hatbands.[2] They kidnaped Dickie Gibson, the store clerk, and drove him to a nearby orange grove. There, Boyde shot Gibson twice in the head, killing him.

A jury convicted Boyde of robbery and kidnaping for robbery in connection with the Baker incident, and robbery, kidnaping for robbery and first degree murder in the Gibson incident.[3] After hearing additional evidence, it sentenced him to death.

Boyde exhausted his direct appeals and state habeas proceedings. He then petitioned for a writ of habeas corpus in federal court, raising a number of claims that his trial and sentencing violated the Constitution.[4] The district court denied his petition, and Boyde appeals.

---

[2]At trial, Ellison and Boyde disagreed over which of the two had gone into the station. Ellison testified that he stayed in the car while Boyde went inside, but Boyde claimed he waited outside as Ellison entered the station.

[3]Ellison was convicted of robbery, kidnaping for robbery and first degree murder, and sentenced to a term of 25 years to life.

[4]Because Boyde filed his habeas petition before April 24, 1996, we do not apply the "substantive review standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ('AEDPA')." *Webster* v. *Woodford*, 369 F.3d 1062, 1066 (9th Cir. 2004); *see also Lindh* v. *Murphy*, 521 U.S. 320, 327 (1997).

### *Brady* Claim

One of the key issues at trial was whether Boyde, rather than Ellison, shot Gibson. Although there was some physical and circumstantial evidence on this score, the big break for the prosecution came when Ellison waived his right to trial by jury, took the stand in his own defense and testified that Boyde had pulled the trigger. According to Boyde, though, the prosecution did more than sit idly by and reap the benefits of Ellison's decision to testify. Boyde claims that the prosecutor and Ellison's lawyer made a secret deal, pursuant to which the prosecutor agreed not to seek the death penalty against Ellison, and Ellison agreed to forgo a jury, take the stand and finger Boyde as the shooter.

Had such a deal been made and disclosed, Boyde's counsel could have used it to impeach Ellison's credibility. But the prosecutor said nothing about any promise of leniency to Ellison. Boyde argues that this failure to disclose violated *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). *See Giglio* v. *United States*, 405 U.S. 150, 153-55 (1972) (finding a due process violation where the prosecution did not disclose that a co-conspirator who testified against the defendant at trial had been promised that he "would not be prosecuted if he cooperated with the Government"). The key question is whether a secret agreement existed.

After an evidentiary hearing, the district court found—as the California Supreme Court had before, *see People* v. *Boyde*, 758 P.2d 25, 38 (Cal. 1988)—that "[t]here was no deal." The district judge emphasized that "it became evident upon listening to the testimony of Carl Ellison, the prosecutor . . . , Ellison's defense counsel . . . , and [Boyde's counsel], that there was in fact no 'secret deal,' and no undisclosed agreement or arrangement of any kind between the prosecutor and Ellison." We can set aside this finding only if it is clearly erroneous. *See Siripongs* v. *Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

**[1]** Here, there was evidence supporting the district court's finding: Both the prosecutor and Ellison's counsel testified before the district court, and both protested vigorously that they had reached no agreement. This testimony, which was expressly credited by the district court, provides a sufficient basis for a finding that no agreement existed.

Boyde nevertheless points out that the prosecutor and Ellison's counsel acted with suspicious synchronicity, which he believes betrays a secret agreement. When Ellison moved to waive a jury trial, the prosecutor joined in the waiver. He explained:

> [T]he People would also join in that waiver and this is not . . . a slow plea by any stretch of the imagination,
> [5] and there are no concessions being made by either side, and it will be anticipated a fully contested trial down the line on the issue of guilt. As the Court well knows, . . . there will be no evidence presented in aggravation other than the facts of the crime and the special circumstances.
>
> While . . . I'm not going to come out in court and concede something at this point in time—it suggests to me that at some point in time the law is going to require the Court—will not put the Court in a position to come back with a finding of death in this case. . . .

---

[5]A "slow plea," or slow plea of guilty, is "an agreed-upon disposition of a criminal case via any one of a number of contrived procedures which does not require the defendant to admit guilt but results in a finding of guilt on an anticipated charge and, usually, for a promised punishment." *People* v. *Tran*, 199 Cal. Rptr. 539, 540 n.2 (1984). For instance, the parties could agree to submit the case on the transcript of a preliminary hearing containing only testimony implicating the defendant.

> I think it is not part of the negotiations for the jury waiver, or anything else. It is just an understanding that there will be no further evidence of aggravation, and that as I interpret the factors . . . the Court will be required as a matter of law, to come back if, in fact, special circumstances are found, . . . with life without parole . . . .

Ellison's counsel then stated, "Mr. Ellison will testify."

Boyde finds it suspicious that the prosecutor signaled to the district court that he would not pursue the death penalty against Ellison shortly after Ellison waived his jury trial right and just before Ellison indicated he would testify. In addition, he argues that the words "negotiations" and "understanding" suggest the prosecutor did so as a result of an agreement with Ellison.

While the prosecutor's prompt assent to Ellison's jury waiver, as well as some of the statements he made to the trial court, may have been sufficient to support a finding that an agreement existed, neither the words nor the circumstances compel such a finding in the teeth of contrary testimony from both the prosecutor and Ellison's attorney. The prosecutor's words and actions can be explained by circumstances other than the existence of an agreement.

As to the prosecutor's joining in the jury waiver, the record contains evidence that the prosecution had independent reasons for wanting to try Ellison's case to the court. Trying Boyde and Ellison to separate juries would have significantly complicated the prosecutor's task by requiring him to try a two-jury case, something he had never done before. This would cause a number of complications, ranging from the mundane (how do you accommodate two juries in the courtroom?) to the critical (how do you coherently present the evidence admissible against only one defendant, particularly if that would require dividing a single witness's testimony?). By

joining in Ellison's jury trial waiver, the prosecutor avoided these issues.

There is also a plausible explanation for the prosecutor's suggestion that he would not seek the death penalty for Ellison: It had been the prosecution's theory all along that Boyde was the major culprit in Gibson's kidnaping and murder, and Ellison was the less-culpable follower. Thus, the prosecution had filed a statement of aggravation in Boyde's case, as it was required to do as a prerequisite for presenting aggravating facts in support of the death penalty, but had filed no such statement as to Ellison. By advising the court that the death penalty would probably not be appropriate for Ellison, the prosecutor simply reassured the trial judge that, by granting the uncontested motion for a bench trial, the judge would not put himself in the position of making the life-and-death decision as to Ellison.

For their part, Ellison and his counsel had perfectly legitimate reasons—independent of the prosecution's preferences—for waiving a jury trial and having Ellison testify. Because Ellison was being tried with Boyde, it was likely that Ellison's jury would hear testimony that incriminated only Boyde, but could result in prejudice against Ellison. Ellison's counsel was also concerned that the jury might be moved by passion about a crime that was well-publicized in the community. As Ellison's counsel put it, he felt confident that the trial judge would "look at the facts and not the emotion."

It is clear from the record that Ellison's counsel and the prosecutor had discussed Ellison's decision to waive a jury. Quite likely, during the course of these discussions, the lawyers would have realized that they had certain common interests: The prosecutor wanted to make the best possible case against Boyde as the triggerman, while Ellison's counsel had every reason to shift the major blame onto Boyde and make his own client out to be the less culpable actor. But the fact that they subsequently acted consistent with those interests

does not necessarily mean they did so pursuant to an agreement that the prosecutor would not seek the death penalty against Ellison if he testified against Boyde.

**[2]** The district judge, who heard live testimony from Ellison's counsel and the prosecutor, emphatically found that no secret deal existed; for the reasons explained, this finding is not clearly erroneous. Because there was no agreement to disclose, the district court correctly rejected Boyde's *Brady* claim.

### Competence

### A

Boyde contends that evidence he gathered after trial proves he was not competent during his trial. *See Steinsvik* v. *Vinzant*, 640 F.2d 949, 954 (9th Cir. 1981) ("[E]ven if the evidence before the trial judge was insufficient to raise a good faith doubt with respect to [defendant]'s competency, he would still be entitled to relief if it now appears that he was in fact incompetent.").[6]

**[3]** An individual is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . he has a

---

[6]Boyde's claim that he was incompetent to stand trial is a "substantive" incompetence claim. This is different from what we have termed a "procedural" incompetence claim, *see Davis* v. *Woodford*, 384 F.3d 628, 644 (9th Cir. 2004), that the trial court should have held a hearing to determine whether the defendant was competent, *see Odle* v. *Woodford*, 238 F.3d 1084, 1087 (9th Cir. 2001) ("We have held that a trial judge must conduct a competency hearing whenever the evidence before him raises a bona fide doubt about the defendant's competence to stand trial, even if defense counsel does not ask for one."). Boyde does not argue that the record before the trial court was sufficient to give rise to any duty for it to hold a competency hearing; he relies instead on new evidence that he claims shows him to have been incompetent.

rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted); *see also Odle* v. *Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001) ("[C]ompetence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense."). On federal habeas, a petitioner is "entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency." *Boag* v. *Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985).

Boyde tried to meet this burden by offering the affidavits of Scilla Ballas, a psychotherapist, and Dr. George Woods, a psychiatrist, who examined him roughly ten years after his trial. Each of them concluded that Boyde suffers from various personality disorders and mental deficiencies. The question is whether their conclusions suffice to raise a real and substantial doubt about Boyde's competence at trial. The district court did not believe so and thus declined to hold an evidentiary hearing on the issue. We review this decision de novo. *Id.* at 1343.

Ballas's affidavit does little to suggest that Boyde was incompetent. She concludes Boyde "suffered from low self esteem, poorly developed intellectual functioning, and a conflicted, confused sense of identity," and that he suffered from depression, but she never explains how any of these disorders relate to Boyde's competency. Nor does she indicate that Boyde's intelligence was so limited, or his depression so severe, as to impede his ability to understand the proceedings against him or assist his counsel in presenting a defense.

Ballas also found that Boyde responded to stressful events with "psychic numbing," which "modulate[s] the experience of extreme, harsh emotional states." But being numb to the

stress of a trial is different from not understanding it, and even farther from being unable to assist with the defense. Again, Ballas does not offer any reason to believe that Boyde's numbing rendered him incompetent to stand trial.

Like Ballas, Dr. Woods describes a variety of psychological problems that Boyde most likely suffered at trial. For instance, Woods notes that Boyde "continued to exhibit symptoms of major depression." These problems, like those Ballas describes, do not give rise to a substantial doubt about whether Boyde was competent to stand trial.

Woods also asserts that Boyde "began to exhibit paranoid delusions" while awaiting trial. Paranoid delusions may in some circumstances render an individual incompetent to stand trial: If a defendant believed his counsel was out to get him, it is questionable whether he could cooperate in preparing a defense. However, Boyde's delusions were not related to his counsel, or indeed to any aspect of his trial. Boyde "was obsessed with checking his bedding, his food and drinks, and making sure that officers didn't 'plant' anything on him." These sorts of delusions, while serious, do not obviously limit Boyde's ability to interact with his counsel, whom he apparently did not fear, nor do they indicate that Boyde failed to understand the proceedings against him.

Nevertheless, Woods opines that Boyde's "symptoms of psychosis, paranoid delusions and biological depressive manifestations precluded him from rationally assisting his attorney in developing strategies for his defense." Whatever the merit of this conclusion in light of the observations on which it is based, *cf. Williams* v. *Woodford*, 384 F.3d 567, 609 (9th Cir. 2004) (finding it significant that "[t]he declarations do not describe how [defendant]'s probable mental impairment interfered with his understanding of the proceedings against him or with his ability to assist counsel in presenting a defense"), Woods's conclusion relies on interviews he conducted with Boyde in 1993, a full decade after Boyde's murder trial.

"[W]e disfavor [such] retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial." *Id.* at 608.[7]

**[4]** All of the contemporaneous evidence suggests that Boyde was competent. Prior to trial, Boyde had been examined by two psychologists, Dr. Linda Waters and Dr. Ronald Offenstein. Dr. Waters examined Boyde when he was arrested in connection with Gibson's murder. She concluded that Boyde's "thought patterns, and other test results, do not suggest central nervous system dysfunction, or 'minimal brain damage.' " Nor did Boyde "show disordered, illogical thinking characteristic of psychosis."

Boyde's other psychological expert, Dr. Offenstein, had been retained by the defense to determine whether Boyde had the "ability to cooperate with Counsel in the presentation of a defense." Offenstein testified that "the issues of cooperation with counsel[ ] were not relevant" to Boyde's case. Offenstein explained that Boyde is "in the category of what we call a character disorder." That is, "[h]e's not psychotic, he is not so greatly disturbed that he has no control of his thought processes; but . . . he is not really very well put together . . . ."

While these contemporaneous psychological observations cast doubt on Woods's retrospective claims, perhaps the most telling evidence that Boyde was competent at trial is that neither defense counsel—who would have had every incentive to point out that his client was incapable of assisting with his defense—nor the trial court even hinted that Boyde was

---

[7]We have been willing to examine "retrospective competency determinations" when "it is possible to make an accurate retrospective evaluation," such as "by consulting contemporaneous medical reports." *Williams*, 384 F.3d at 609-10. The only reports produced around the time of Boyde's trial were done by Boyde's psychological experts, and neither of them concluded that Boyde was incompetent. *See* pages 4502-03 *infra*.

incompetent. *See Hernandez* v. *Ylst*, 930 F.2d 714, 718 (9th Cir. 1991); *cf. Williams*, 384 F.3d at 608 ("We find especially relevant defense counsel's opinion that [defendant] was competent to stand trial."). This is not for lack of opportunity to observe him: Boyde testified on his own behalf. Though his testimony spans over 300 pages of trial transcript, Boyde can point to nothing in it—or anywhere else in the record— suggesting he was not completely aware of what was going on. *Cf. Boag*, 769 F.2d at 1343 ("In cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic and irrational behavior during the course of the trial, or lengthy histories of acute psychosis and psychiatric treatment." (citations omitted)).

**[5]** Given the abundant evidence that Boyde was competent at trial, Dr. Woods's retrospective assertion to the contrary does not provide a substantial basis for questioning Boyde's competence. The district court did not err in declining to hold an evidentiary hearing on this issue.

### B

Boyde argues that his counsel was ineffective in failing to request a competency hearing before trial. Because the evidence indicates that Boyde was competent to stand trial, we reject this claim. *See Davis*, 384 F.3d at 647.

### Actual Innocence

### A

Boyde's new mental health evidence does double duty. In addition to supporting his argument that he was incompetent, Boyde contends it proves he was incapable of forming the intent required for first-degree murder: As a result of his "neurological, emotional, and psychological impairments," he "lacked the mental capacity to control or premeditate his actions or to form the requisite criminal intent for the com-

mission of capital murder." Even if he killed Gibson, that is, Boyde claims he is innocent of first-degree murder.

Boyde does not suggest that the evidence presented at trial was insufficient to support his conviction. *Cf. Jackson* v. *Virginia*, 443 U.S. 307, 324 (1979) (holding that a defendant is "entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt"). Instead, he argues that evidence outside of the trial record establishes that he is innocent. His argument is therefore a "freestanding" actual innocence claim. *Carriger* v. *Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (citing *Herrera* v. *Collins*, 506 U.S. 390 (1993)). The standard for establishing such a claim on habeas review is " 'extraordinarily high.' " *Id.* (quoting *Herrera*, 506 U.S. at 417). Boyde "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.*[8]

To support his claim, Boyde points to Dr. Woods's affidavit, which indicates that, as a result of psychological trauma in his childhood, Boyde experiences "disassociation," an "immediate psychological response to an intolerable experience" in which an individual " 'dis-associate[s]' the normally integrated aspects of the consciousness, including functions such

---

[8]Boyde contends that we should instead apply *Jackson*'s standard of review and ask whether, in light of his mental health evidence, a rational trier of fact could convict him. *See* 443 U.S. at 324. He claims that *Herrera* was concerned only with claims of actual innocence "based on *newly discovered evidence* presented in *successive* habeas petitions, not to petitions in which the merits are reviewed for the first time and which are not based on new evidence." Apparently he believes that, because his mental health evidence describes him at the time of the crime, it is not "new evidence." However, it is clear that "the sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' " *Herrera*, 506 U.S. at 402 (quoting *Jackson*, 443 U.S. at 318). Boyde's mental health evidence was not presented at trial and is thus not "record evidence." Nor is it significant that Boyde raises his claim in his first federal habeas petition; *Herrera*'s analysis concerns the limits of our habeas jurisdiction generally.

as memory, perception, motivation, and judgment" (alteration added). Woods notes that disassociation can lead to "behavior which is sudden, unpremeditated and uncharacteristic of the individual," and concludes that, at the time of his crimes, Boyde was "in a depressed, dissociated state that precluded him from appreciating the nature and gravity of his actions."

**[6]** This affidavit is insufficient to establish Boyde's innocence. "Because psychiatrists disagree widely and frequently on what constitutes mental illness, a defendant could . . . always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion." *Harris* v. *Vasquez*, 949 F.2d 1497, 1515 (9th Cir. 1990) (quoting *Ake* v. *Oklahoma*, 470 U.S. 68, 81 (1985)) (internal quotation marks omitted). Accordingly, "it is clear that the mere presentation of new psychological evaluations . . . does not constitute a colorable showing of actual innocence." *Id.* at 1516; *see also Griffin* v. *Johnson*, 350 F.3d 956, 965 (9th Cir. 2003). We therefore reject Boyde's actual innocence claim.

B

Boyde argues that his counsel was ineffective in failing to present a defense of mental incapacity to premeditate at his trial. However, Boyde's counsel had access to statements Boyde and Ellison made to the police that indicated Boyde knew exactly what he was doing during the Baker and Gibson robberies. He also had retained two experts, including one who was asked to look for possible defenses, who examined Boyde and determined that he was sufficiently in control of his actions. *See Hendricks* v. *Calderon*, 70 F.3d 1032, 1038-39 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."). In view of this evidence, Boyde's counsel was not ineffective in choosing to devote his time and resources to other aspects of the case.

### *Batson* Claim

The prosecutor used a peremptory challenge to remove Ernestine Perdue, a black woman, from the jury. Boyde claims that this challenge violated the Fourteenth Amendment because it was based on Perdue's race.[9]

In *Batson* v. *Kentucky*, 476 U.S. 79 (1986), the Supreme Court articulated a three-step process for considering claims of racial bias in the exercise of peremptory challenges. The defendant must first make a prima facie showing that "the prosecutor used [peremptory challenges] to exclude . . . veniremen [of defendant's race] from the petit jury on account of their race." *Batson*, 476 U.S. at 96. If the defendant makes such a showing, "the burden shifts to the State to come forward with a neutral explanation for challenging [the] jurors." *Id.* at 97. Finally, the trial court has "the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

### A

The state does not dispute that Boyde made a prima facie showing of discrimination in the selection of his jury. In any event, the trial court asked the prosecutor to explain his challenge to Perdue when Boyde's counsel objected to it; after the prosecutor did so, the court "ruled on the ultimate question of intentional discrimination" by concluding that the challenge was not racially motivated. *See Hernandez* v. *New York*, 500 U.S. 352, 359 (1991) (plurality op.). At that point, "the preliminary issue of whether the defendant had made a prima

---

[9]Boyde also requests that we expand the certificate of appealability ("COA") to include similar claims with respect to four other jurors. *See Slack* v. *McDaniel*, 529 U.S. 473, 481-82 (2000) (applying AEDPA's COA requirement to appeals, like this one, that were filed after April 24, 1996). Because he has not shown that "reasonable jurists would find the district court's assessment of [these] constitutional claims debatable or wrong," *id.* at 484, we decline to do so.

facie showing [became] moot." *Id.*; *see also United States* v. *Bishop*, 959 F.2d 820, 824 (9th Cir. 1992).

B

The prosecutor offered a number of explanations for challenging Perdue:

> My problem with Mrs. Perdue is that if she were a White juror I would have no question that I would excuse her; and, the only reason I even considered keeping her was because she was Black and I thought to myself I shouldn't have to be faced with that choice, that I should be able to exercise a peremptory challenge regardless of what a person's color was.

> I had an experience about six months ago where I prosecuted a murder of a wom[a]n about the same age as Mrs. Perdue, who was also a grandmother who was also in the Seventh-[D]ay Adventist Church, who remarkably was similar to Mrs. Perdue in that I think she was involved in the church welfare work with the Seventh-Day Adventist Church and was very highly thought of in the apartment complex in which she lived. Apparently she was much like an aunt to all the people there or, you know, the world's grandmother. And, I would have a hard time believing that someone like that—and I equate that with Mrs. Perdue as well—would be able to, when it came right down to it, vote for the death penalty. And, I believe she would be swayed by that, and I am just uncomfortable with it.

> I'm also uncomfortable with her because there were some hesitations that I saw when she was discussing the death penalty as opposed to life without possibility of parole. I did notice some hesitation

there, but that is not my primary difficulty with Mrs. Perdue.

I am also somewhat leary, she's a mother, a grandmother, she did come from Perris. I have had bad experiences in my past with jurors from Perris and I am distrustful with certain areas of that community. As well as she having moved as much as she's moved within the last few years, to Palm Springs, to Needles and back to Riverside indicating a more transient type person than I would like to have on a case like this.

Also, her appearance; large, heavy-set, older middle-aged wom[a]n, just—just does not strike a responsive c[h]ord to me and that is why I excused her. I can't say specifically, you know, that it was this answer or that answer to this particular question that indicated that she was biased or would be unfair, but it was just the whole persona, and it is not because she's Black.

We must determine whether these explanations were race-neutral. *See United States* v. *McCoy*, 23 F.3d 216, 217 (9th Cir. 1994) (per curiam) ("Whether the prosecutor's asserted reason for a challenge is race-neutral on its face is a question of law reviewed de novo."); *see also Tolbert* v. *Page*, 182 F.3d 677, 680 n.5 (9th Cir. 1999) (en banc). To do so, we consider only the "facial validity of the prosecutor's explanation," *Purkett* v. *Elem*, 514 U.S. 765, 768 (1995) (per curiam) (quoting *Hernandez*, 500 U.S. at 360) (internal quotation marks omitted), not its persuasiveness. That is, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360) (internal quotation marks omitted).

[7] Four of the prosecutor's reasons are plainly race-neutral: Perdue's grandmotherliness, her hesitations, her

"transient" background and her "persona." But Boyde argues that one of the prosecutor's explanations requires closer scrutiny. The prosecutor stated he was "distrustful with certain areas" of Perris. We have recognized that residence can be used as a proxy for race, *see Bishop*, 959 F.2d at 825-26, and thus that striking jurors on the basis of their residence might not be race-neutral.

In *Bishop*, the prosecutor excused from the jury a black eligibility worker from Compton because he believed the struck juror was "likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people." *Id.* at 822. We noted that his explanation relied on a "group-based presupposition[ ] applicable in all criminal trials to residents of poor, predominantly black neighborhoods," *id.* at 825; it "both reflected and conveyed deeply ingrained and pernicious stereotypes." Because the prosecutor used residence "as a surrogate for racial stereotypes," *id.* at 826, his explanation based on residence was not race-neutral.

**[8]** In this case, by contrast, the prosecutor's comment about Perris did not rely on any group-based presupposition. The prosecutor did not mention race or draw on any racial stereotype. There is nothing in the record to suggest that the prosecutor's bad experiences with people from Perris were tied to race. Nor did Boyde offer anything at the time of trial or in his post-conviction proceedings to show that the prosecutor's reference to Perris should be understood as a surrogate for race. There is no "discriminatory intent . . . inherent in the prosecutor's explanation," *Purkett*, 514 U.S. at 767 (quoting *Hernandez*, 500 U.S. at 360) (internal quotation marks omitted), and thus his use of residence, like his other explanations, was race-neutral.[10] Because the prosecutor met his burden of

---

[10]Boyde argues that the prosecutor's use of residence was nonetheless invalid because the prosecutor did not explain how Perdue's residence was relevant to the facts of Boyde's trial. *Bishop* did suggest that the presence

articulating a race-neutral explanation for challenging Perdue, the trial court properly proceeded to the third step of the *Batson* analysis.

## C

The trial judge found that the prosecutor "is color blind in the exercise of his peremptory challenges. It is not on the basis of color." After further discussion with the parties, he reiterated this view: "It is clear that it is not based upon color." We review this factual finding for clear error. *See Tolbert*, 182 F.3d at 680 n.5.

The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. A defendant cannot satisfy his "ultimate burden" if he does not offer any evidence to

---

or absence of a "nexus between the [challenged] jurors' [residence] . . . and their possible approach to the specific trial" was significant in determining whether the use of residence was race-neutral. 959 F.2d at 825. It noted, for instance, that residence may properly be "utilized as a link connecting a specific juror to the facts of the case," such as when a juror is challenged because he is from the same neighborhood as a potential witness. *Id.* at 826. The theory behind *Bishop*'s argument seems to be that an unexplained use of residence may actually be a pretext for racial discrimination. *Id.* at 825-26.

The Supreme Court has since made clear, however, that we do not consider whether an explanation is pretextual when we decide, in *Batson*'s second step, whether it is race-neutral. We consider only whether the explanation is *facially* race-neutral. *See Purkett*, 514 U.S. at 768. It may be unpersuasive for a prosecutor to use residence without attempting to tie it to the facts of the case. A trial court could consider that lack of explanation when it decides, in *Batson*'s third step, whether to credit the prosecutor's explanation or find that residence was a pretext for what was really a race-based challenge. *See id.* ("It is not until the *third* step that the persuasiveness of the justification becomes relevant."). To the extent *Bishop* suggests that the *race-neutrality* of an explanation depends on its persuasiveness, it has been effectively overruled by *Purkett*. *See Miller* v. *Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

rebut the prosecutor's race-neutral explanation. Accordingly, we must consider "[t]he correctness of the court's ruling . . . in terms of the information that was before [it] at the time that the *Batson* objection was raised." *United States* v. *Bauer*, 84 F.3d 1549, 1554-55 (9th Cir. 1996).

**[9]** Boyde did not explain to the trial court why it should disbelieve the prosecutor's race-neutral explanations. His counsel agreed that the prosecutor was "acting in good faith," and stated that he did not "believe that [the prosecutor] is standing before the Court contriving reasons why he wishes to exercise a peremptory."[11] Because he did not rebut the prosecutor's race-neutral explanations, Boyde failed to carry his burden of persuasion. We have no basis for second-guessing the trial court's determination.

## Evidence of Prior Crimes

### A

The prosecution presented evidence that, in 1976, Boyde had robbed the same 7-Eleven station that was robbed in the Gibson robbery. The clerk who had been on duty at the time of the 1976 robbery testified that Boyde and an accomplice demanded money from him at gunpoint and stole various items, including cigarettes. They forced the clerk to get into the trunk of his car, which they then stole and drove out of town before releasing him a few hours later.

Boyde suggests the prosecution used this evidence to persuade the jury that he was a bad person, who was thus likely

_____

[11]The theory on which he rested his challenge was that, "even giv[ing] full credit to the Prosecutor's stated reasons, . . . the rights of my client to be tried by a jury of his peers, which would include a representative number of blacks where possible, where appropriate, would outweigh the reasons as propounded by the District Attorney." That is, he believed that striking Perdue on *race-neutral* grounds was improper, as it resulted in a jury that was not racially balanced.

to have shot Gibson. He argues that the evidence of his earlier robbery was irrelevant to any issue other than his character, and that its admission violated due process. *See McKinney* v. *Rees*, 993 F.2d 1378, 1384-85 (9th Cir. 1993).

A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision. "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." *Jammal* v. *Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). In such cases, "we must rely on the jury to sort [the inferences] out in light of the court's instructions." *Id.* Admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw" from it. *Id.*

Boyde tries to meet this standard by positing that the "only conceivable inference [from his involvement in a prior robbery-kidnaping] was the improper one that [his] prior acts made him more likely to be the instigator and triggerman." That is one possible inference, but it is not the only one.

The prosecution had to prove that Boyde committed the Gibson robbery. One typical—and constitutionally permissible—way to do this is to show that the crime shared certain characteristics—a modus operandi—with other crimes that Boyde had committed. *See, e.g.*, *United States* v. *Sidman*, 470 F.2d 1158, 1166 (9th Cir. 1972). Therein lies the relevance of the 1976 robbery: The fact that Boyde had previously robbed the same 7-Eleven store, at gun point, with an accomplice, in a crime that involved kidnaping the clerk, makes it more likely that he was involved when a crime sharing those characteristics occurred later. *See McKinney*, 993 F.2d at 1382 (noting that evidence is relevant if it "tend[s] to make any fact relevant to the[ ] elements [of the crime] more or less probable"). That is the basis on which the trial court

admitted the evidence; the court explained: "It goes to the identity. . . . [I]t is unique, it is unus[u]al, and it is so similar."[12]

Boyde responds that evidence of the 1976 robbery was "not necessary to show modus operandi or other indicia of identity, as Boyde's identity and presence during the [Gibson] offense was undisputed." At trial, Boyde took the stand in his defense and admitted he was with Ellison at the time of the robbery, denying only that he had been the one to shoot Gibson. When the trial court admitted evidence of the earlier robbery during the prosecution's case in chief, though, Boyde had not yet testified, nor was it clear what defense his counsel would present. Moreover, Boyde claimed that he had waited in the car while Ellison went into the store to get cigarettes, and that Ellison decided to rob the store on his own. The prosecution's evidence undercut this claim by showing that the robbery was similar to Boyde's previous robbery. In any event, as the trial court well understood, the fact that the prosecutor had strong evidence to prove that Boyde had committed the robbery does not mean the jury should not hear other evidence, as "we don't know [in advance] what the jury is going to believe or what items of evidence they [will] choose to believe."

[10] Because the jury could draw a permissible inference from evidence of Boyde's 1976 robbery, admission of that evidence did not violate due process, so long as the jury was instructed that it could not draw any improper inferences from it. In this case, the trial judge instructed the jury that evidence of Boyde's other crimes "was not received and may not be considered by you to prove that he is a person of bad character, or that he has a disposition to commit crimes." He explained to the jury:

---

[12]The court also admitted the evidence because it was relevant in determining whether Boyde committed the Baker robbery. In that incident, as in Boyde's 1976 robbery, the robber targeted a gas station, used a weapon and ultimately kidnaped the clerk.

[E]vidence [of prior crimes] was received and may be considered by you only for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case, which would further tend to show the identity of the person who committed the crime, if any, of which the defendant is accused.

**[11]** Because we must presume that the jury followed its instructions to consider only the permissible inference that Boyde committed the Gibson robbery, we conclude that admission of evidence about the prior robbery did not violate due process.

## B

The 1976 robbery was not the only one of Boyde's past crimes the jury heard about. When Boyde testified, his own counsel questioned him about his prior robberies, and the prosecutor cross-examined him vigorously about the details of those crimes. Boyde argues that his counsel was ineffective in allowing the jury to hear this evidence.

**[12]** He suggests that counsel's error was failing to object to the prosecutor's cross-examination. In some circumstances, it would be ineffective for counsel not to object to evidence of the defendant's prior crimes. *See, e.g.*, *Crotts* v. *Smith*, 73 F.3d 861, 866 (9th Cir. 1996). To succeed on such a claim, however, the defendant must show that he was prejudiced by counsel's error. This, in turn, requires a showing that, had his counsel objected, "it is reasonable that the trial court would have granted [the objection] as meritorious." *Wilson* v. *Henry*, 185 F.3d 986, 990 (9th Cir. 1999). In this case, Boyde can make no such showing: An objection would have failed because his counsel opened the door for the cross-examination by bringing up the crimes during direct examina-

tion. Boyde's counsel was ineffective only if he was ineffective in bringing up the prior robberies in the first place.

In a declaration given shortly after Boyde's trial, his counsel explained his decision to question Boyde on his prior crimes. After Ellison testified and fingered Boyde as Gibson's killer, Boyde decided that he wanted to testify, and he insisted on doing so against his counsel's advice. By testifying, Boyde would put his credibility at issue, and, under California law, certain evidence of prior crimes could be admitted to impeach him. Recognizing this, Boyde's counsel concluded that Boyde "would be better served in meeting the question of his priors head-on and dealing with them forthrightly in front of the jury." This is precisely the sort of tactical decision that counsel is expected to make at trial. *Cf. Lang* v. *Callahan*, 788 F.2d 1416, 1418 (9th Cir. 1986) (finding that "counsel's strategic decision to stipulate [the admissibility of certain statements in the hope that the deputy prosecutor would agree to admit certain other statements] falls well within the range of reasonable professional assistance").

Boyde argues that his counsel's strategy was nonetheless unreasonable because he was mistaken that evidence of Boyde's prior convictions could be admitted on cross-examination. Cal. Evid. Code § 788 provides that, "[f]or the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness . . . that he has been convicted of a felony." But Cal. Evid. Code § 352 gives the trial judge discretion to exclude evidence that would otherwise be admissible "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." Reading these two provisions together, the California Supreme Court held that, when a defendant takes the stand in his own defense, the trial judge has discretion "to exclude evidence of prior felony convictions when their probative value on credibility is outweighed by the risk of undue prejudice." *People* v. *Beagle*, 492 P.2d 1, 7-8 (Cal. 1972).

*Beagle* provided a few guideposts in how a trial court should exercise this discretion. It offered the "rule of thumb" that "convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not." *Id.* (quoting *Gordon* v. *United States*, 383 F.2d 936, 940 (D.C. Cir. 1967)) (internal quotation marks omitted).[13] In addition, the trial court should consider the "nearness or remoteness of the prior conviction." *Id.* (quoting *Gordon*, 383 F.2d at 940). And, the court should disfavor use of a prior conviction if it is "for the same or substantially similar conduct for which the accused is on trial." *Id.* (quoting *Gordon*, 383 F.2d at 940).[14]

Boyde argues that because his "prior robberies involved no 'dishonest' acts," they would have been excluded under *Beagle*. Although he is correct that robbery is assaultive, it also involves stealing, an act of dishonesty that bears on credibility. The California Supreme Court had therefore determined

---

[13]After Boyde's trial, the California Constitution was amended to broaden the circumstances in which evidence of prior felony convictions can be admitted. *See* Cal. Const. art. I, § 28(f); *see also People* v. *Castro*, 696 P.2d 111, 113 (Cal. 1985) (interpreting section 28(f) as authorizing "the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty," subject to the trial court's discretion to exclude unduly prejudicial evidence under Cal. Evid. Code § 352). Because our concern is what Boyde's counsel did before and during trial, we consider California law as it existed prior to this constitutional amendment.

[14]*Gordon*, the case on which *Beagle* principally relied, emphasized that it did not "place[ ] any limitations on established rules which permit evidence of prior criminality to show a 'pattern' of offenses." 383 F.2d at 940 n.10. Rather, it limited the use of prior convictions for the purposes of impeaching a defendant's credibility. *See id.* at 940; *see also People* v. *Rist*, 545 P.2d 833, 839 (Cal. 1976) (criticizing the trial court for allowing the prosecution to impeach a robbery defendant using evidence of a prior, similar robbery). With the exception of the 1976 robbery, *see* pages 4516-17 *supra*, the prosecution here did not argue, nor did Boyde's counsel believe, that Boyde's prior robberies were admissible because they established a modus operandi. Instead, Boyde's counsel believed they would be admitted under *Beagle* to impeach Boyde.

that robbery "is a crime which is both larcenous and assaultive, and thus bears in part on the perpetrator's integrity and veracity." *People* v. *Rist*, 545 P.2d 833, 839 (Cal. 1976). Boyde's robberies were also relatively recent, having been committed only five years before the trial.

The one basis on which the trial judge might have excluded the evidence is that Boyde's prior robberies involved the same offense as the robberies for which he was on trial, and thus that evidence of the prior crimes might be too prejudicial. But while *Beagle* emphasized that "convictions which are for the same crime should be admitted sparingly," 492 P.2d at 8 (quoting *Gordon*, 383 F.2d at 941), it looked to evidence of different crimes as an alternative, *id.* ("Where multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime . . . ." ); *see Rist*, 545 P.2d at 839 (holding that a trial court abused its discretion in admitting evidence of prior robberies in a robbery prosecution where the prosecution could have impeached the defendant using evidence of other, dissimilar crimes). Here, there were no other recent crimes that the prosecutor could have used to impeach Boyde.

In sum, it is unclear how the trial court would have applied *Beagle* to Boyde's robberies. Because the crimes bore on Boyde's credibility and were relatively recent, and because the prosecution had no other crimes it could use to impeach Boyde, Boyde's counsel could reasonably believe that the court would have admitted the evidence.

Moreover, by eliciting testimony about the robberies, Boyde's counsel was able to bolster his argument that Ellison, not Boyde, killed Gibson. Boyde had robbed a lot of people, but he had never killed anyone. And even though he had previously kidnaped gas station attendants, he had always let them go without hurting them. The Gibson robbery ended differently, and Boyde's counsel explained to the jury that the reason for this difference was Ellison. He argued:

How is it that Richard Boyde is involved in ten, eleven robberies without hurting anybody. Gets out here and Dickie Gibson is dead. The only difference I submit that stands out . . . is that along with Richard Boyde and that orange grove was Carl Franklin Ellison who was scared of being caught, who was frightened of being identified . . . . Can you say with absolute certainty when that first bullet was fired that it wasn't fired by Carl Ellison with his eyes closed . . . ?

**[13]** In the exercise of his professional judgment, Boyde's counsel reasonably concluded that the trial court would admit evidence of Boyde's prior crimes. He decided to confront the crimes directly, and he even developed them into a theory that Ellison must have been the triggerman. This strategy didn't work, but it was not ineffective assistance.

## Cumulative Guilt Phase Error

Because we find no merit in Boyde's claims of constitutional error in the guilt phase of his trial, we also reject his contention that he was prejudiced by the cumulative effect of the claimed errors.

## Penalty Phase Errors

Boyde raises a number of claims that his counsel was ineffective during the penalty phase of his trial. To support his ineffective assistance claim, Boyde must show both that his counsel's performance fell below the "wide range of professionally competent assistance" and that he was prejudiced by the deficient performance. *Strickland* v. *Washington*, 466 U.S. 668, 690, 693-94 (1984). We must analyze each of his claims separately to determine whether his counsel was deficient, but "prejudice may result from the cumulative impact of multiple deficiencies." *Cooper* v. *Fitzharris*, 586 F.2d 1325, 1333 (9th

Cir. 1978) (en banc); *see also Harris ex rel. Ramseyer* v. *Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995).

A

Boyde argues that his counsel failed to investigate mitigating childhood abuse, and that he failed to introduce the evidence that his limited investigation did uncover. Boyde's counsel had retained an investigator to interview potential witnesses, and one individual he interviewed was Helen Kendricks, Boyde's youngest sister, who ultimately testified on Boyde's behalf at his sentencing. Much of what Kendricks discussed with the investigator would become part of her testimony at trial. One part that did not was her allegation that she, Boyde and the other siblings were regularly and violently abused by Boyde's mother and stepfather. She also explained that the stepfather had sexually molested the female siblings, and that Boyde had been aware of this abuse from an early age.

[14] Boyde's history of suffering violent physical abuse, as well as the family history of sexual abuse he had known about growing up, is the sort of evidence that could persuade a jury to be lenient. "Evidence regarding social background and mental health is significant, as there is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' " *Douglas* v. *Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (quoting *Boyde* v. *California*, 494 U.S. 370, 382 (1990) (Boyde's case on direct review) (quoting *Penry* v. *Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California* v. *Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)))). Because of the importance of background in convincing a jury to spare a defendant's life, the Supreme Court has recognized that it is ineffective for counsel to fail to present such evidence to the jury. *See Williams* v. *Taylor*,

529 U.S. 362, 390-99 (2000). Boyde's counsel was deficient in failing to do so here.

**[15]** As disturbing as counsel's decision not to present the evidence of abuse that he had discovered was his failure to follow up on this evidence by investigating what other mitigating evidence might exist. Had counsel asked Kendricks for more details about Boyde's beatings, he would have learned how severe they had been. According to Kendricks, on one occasion Boyde's mother beat him with an extension cord; when he didn't cry, she responded by promising that "she was going to keep beating him until he cried." The ensuing abuse was so severe that the other children began to cry and pled with their mother to quit beating Boyde, but she "just kept beating him" until, finally, "one tear trickled out and she stopped." On a different occasion, Boyde's mother hit him in the head with a vase with enough force that "it drew blood and he had to get stitches." Kendricks recalled Boyde being "dazed by the blow to his head and . . . stumbling around afterwards." Bad as these beatings were, Boyde's stepfather was "much worse than [Boyde's] mother as far as beating the kids"; he would "beat [them] longer and would beat [them] all over the room."

Kendricks also explained more about the stepfather's sexual abuse of the female siblings, which began for her when she was about 11 or 12 years old. None of the siblings was comfortable bringing up the sexual abuse with their mother; they worried that she would side with her husband, and that the consequences of mentioning it would be unpleasant. Boyde had participated in discussions among the siblings in which they gathered courage to approach their mother about it. Eventually, Betty Sauls, another of Boyde's sisters, informed her of the abuse. But, as feared, her mother did not believe her, pulled a gun on Sauls and threw her out of the house.

Kendricks emphasized that, if Boyde's counsel "had asked me to describe what it was like growing up in my family and

how it affected [Boyde] and the rest of us, I would have told him." The jury may well have had sympathy for Boyde because of his damaged childhood. Yet Kendricks was never asked to describe it.

Kendricks was not the only one of Boyde's siblings who could have testified about his childhood abuse. Sauls explained in an affidavit that their mother would beat the children with "anything she could get her hands on—straightening combs, water hoses, bricks, brushes, lamps." And Boyde's oldest sister, Beatrice Will, explained that their mother "would beat [Boyde] until he cried, using a switch or an extension cord. She would really whip [Boyde]—on his back, his butt, anywhere she could hit him. She mostly used an extension cord, but would beat you with the first thing she got her hands on." Both Sauls and Will corroborated Kendricks's report of frequent sexual abuse.

**[16]** Even though Boyde's counsel was aware of physical and sexual abuse by Boyde's mother and stepfather, he failed to investigate that abuse. As a result, he did not discover the vast evidence that Boyde had been violently abused, and that he knew his sisters had been molested. Because the defendant's background is so important in the sentencing process, "[i]t is imperative that all relevant mitigation information be unearthed for consideration." *Douglas*, 316 F.3d at 1088 (quoting *Caro* v. *Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)) (internal quotation marks omitted). The evidence that Boyde's counsel discovered "revealed the need to dig deeper," *id.*, and his failure to do so fell far short of professional standards, *see Williams*, 529 U.S. at 396 (finding that "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *see also Wiggins* v. *Smith*, 539 U.S. 510, 521-23 (2003).

The harm caused by counsel's failure to investigate and present evidence of abuse was not just that the jury was deprived of relevant information about Boyde's childhood.

Boyde's counsel called both Boyde's mother and stepfather—the alleged abusers—to testify during sentencing. We cannot fault this decision, as a defendant's parents will often make the most persuasive case to the jury for sparing their son's life. But the evidence he elicited from the parents suggested—in stark contrast to what counsel's own investigation had revealed—that Boyde had a normal, non-violent childhood.[15]

Boyde's stepfather explained that Boyde was "a normal child just as any other child." He admitted that he would discipline Boyde occasionally using items such as belts, but denied any severe beatings. In all, he estimated that he had to discipline Boyde on only four occasions. Likewise, when Boyde's mother was asked whether she "raise[d] [Boyde] to exhibit violence in any form," she replied: "No, I didn't want him in no violence, I ain't never taught him violence at no time."

The jury, left to wonder how Boyde learned to commit such violent acts, could not look to his childhood as an explanation—his parents' testimony and counsel's deficiency took care of that—but must instead have concluded that he grew violent *despite* his childhood. The most likely explanation was provided by counsel.

Boyde's counsel argued in his closing that Boyde was a product of California's youth and adult corrections system, where prisons operate as "schools for crime." Perhaps that explanation could have inspired sympathy for a defendant like

---

[15]This testimony was hardly unexpected. In an earlier interview with one of Boyde's investigators, Boyde's mother described Boyde's childhood as uneventful. The investigator reported her claims that Boyde's stepfather "helped raise her children and had always treated them good and was never a mean stepfather to the children. He gave them money and there were no arguments or problems between the children and their stepfather." Upon reviewing the investigator's report, an attorney who assisted Boyde's counsel remarked that she "obviously . . . know[s] or should know more than [she] told us."

Boyde, who had spent much of his life in prison, and we have no doubt that this element of counsel's strategy was within the range of reasonable professional assistance. But whatever sympathy he hoped to create was quickly extinguished through the following argument:

> Now, obviously in this case we can't put [California's penal] institutions on trial, it wouldn't be appropriate to do that here, but I was struck by a scene in the movie Helter Skelter. . . . A key point in the trial, Charlie Manson got up to argue for himself, his own case, he got up and he said "I am a child of your prisons," he said, "You may blame me all you wish, but I was born and raised and taught and learned to live and breathe in your institutions, your prisons."
>
> And Richard Boyde, to a certain extent, is a child of your institutions . . . .

**[17]** It is difficult to conceive of any possible justification for referring to a notorious mass murderer in trying to persuade the jury to spare Boyde's life, and certainly not one that warrants comparing Boyde to that murderer.[16] In a consider-

---

[16]This was not the only inexplicable reference in the closing. Towards the end of his argument, Boyde's counsel quoted an article by Norman Mailer in which Mailer opines that "[a] male leading a dull life, full of oppression, who finds himself a little more choked with rage each year, will secretly be drawn to capital punishment as a release from the monotony of his existence." Thus, counsel suggested, Boyde committed murder "just to get a little attention," and that he wanted to be caught "to destroy himself."

Boyde's counsel urged the jury not to help Boyde destroy himself, but the harm may already have been done. By informing the jury that, in a way, Boyde wanted to die, his counsel "effectively relieved the jurors of the heavy responsibility inherent in imposing a sentence of death." *Wade v. Calderon*, 29 F.3d 1312, 1332-33 (9th Cir. 1994) (Reinhardt, J., concurring in part and dissenting in part). Because counsel's other errors amount to ineffective assistance, we need not decide whether this error alone would suffice.

able understatement, the district judge remarked: "Although it was under the circumstances a sound strategic decision to attempt to lay some of the blame for Boyde's character on the failings of the California Youth Authority, it was probably a mistake to employ a quotation from Charles Manson to make this point."

## B

**[18]** Because of counsel's errors, the jury was not presented with key evidence that could have inspired sympathy for Boyde on account of his childhood. Instead, the jurors heard testimony that Boyde had fallen into violence despite a normal upbringing, and counsel's only explanation for this development involved comparing Boyde to Charles Manson. Errors of this magnitude are a sufficient basis for finding prejudice. *Cf. Douglas*, 316 F.3d at 1090 (suggesting that counsel's failure to introduce mitigating evidence may be prejudicial if that evidence, "[e]ven if . . . not enough to negate an element of the underlying offense, . . . could have invoked sympathy from at least one member of the jury at the penalty phase").

But, the state argues, even if the jury had heard all of the available mitigating evidence, the aggravating evidence was so overwhelming that the jury would have imposed a death sentence anyway. The prosecution presented considerable aggravating evidence. Two former classmates of Boyde's testified that he had assaulted them in 1974; another individual testified that Boyde had thrown bricks at her van. Boyde's parole agent at CYA testified that Boyde missed meetings and stole his stepfather's gun. Various people testified about Boyde's prior robberies, and a sheriff's deputy explained that Boyde had smoked marijuana in jail while awaiting trial. Finally, the prosecution presented evidence that Boyde had plotted an escape to avoid trial, and that he had planned to use a gun if necessary.

However, the relevant question for considering the cumulative prejudicial effect of counsel's errors is not whether the

sentence would have been different in light of all of this aggravating evidence. Much of the evidence presented was actually inadmissible, and could have been excluded had Boyde's counsel objected to it. Our prejudice inquiry must focus on whether the result would have been different in light of the evidence that would have been presented to the jury had Boyde's counsel not been deficient.

**[19]** Cal. Pen. Code § 190.3 provides that "no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." Boyde's non-violent escape from CYA, as well as his delinquency while there, theft of a gun and marijuana use, do not involve violence. In fact, the California Supreme Court determined in Boyde's direct appeal that this evidence had been improperly admitted. *Boyde*, 758 P.2d at 46 ("Most of the evidence presented about Boyde's CYA commitment and parole . . . did not pertain to a prior felony conviction . . . or criminal activity involving force or violence . . . . The same may be said for testimony by officers about Boyde's untruthfulness, possession of stolen property and possession of marijuana in jail."). Because the jury in a capital case is asked to evaluate whether aggravating circumstances in a defendant's background outweigh whatever mitigating value it can find, counsel must be especially vigilant to ensure that the jury is not presented more aggravating facts than the law allows. Boyde's counsel was deficient in failing to object to this harmful evidence, *see Crotts*, 73 F.3d at 866 (9th Cir. 1996) ("Reasonably competent counsel undoubtedly would have objected to the admission of such prejudicial evidence."), which would probably have been excluded had he done so.

This was not the only evidence that should have been objected to. The prosecution did not give notice before trial that it would introduce evidence of Boyde's 1974 assault and one of his robberies. California law provides that, subject to

limited exceptions inapplicable here, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." *See* Cal. Pen. Code § 190.3; *see also Boyde*, 758 P.2d at 46 (recognizing that evidence of these two incidents "was improperly admitted because the prosecution had failed to give proper notice, as required by section 190.3"). Again, Boyde's counsel failed to object. And, again, an objection would likely have kept the jury from hearing this evidence.

C

Boyde was prejudiced by his counsel's multiple errors during the penalty phase if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Cooper*, 586 F.2d at 1333. In other words, we ask whether, absent the errors, there is a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Because of counsel's errors, Boyde's jury was presented with a view of his past that omitted his history of physical abuse and his family's history of sexual abuse. Not only was it deprived of this evidence that could have engendered sympathy, Boyde's counsel all but assured through his summation that the jury would not be sympathetic based on the evidence he did present. Then, the jury was asked to balance this warped view of Boyde's background against an extensive amount of aggravating evidence that it should never have heard.

[20] Of course, we cannot be certain what the jury would have done had it been given all of the relevant mitigating information and had it not been presented with inadmissible

aggravating evidence. But the fact that the task it actually undertook differed so profoundly from the one it would have performed had Boyde's counsel not been deficient is enough to undermine our confidence in the sentence it ultimately delivered. We find a reasonable probability that the jury would have imposed a different sentence but for the errors Boyde's counsel made. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The district court should have granted a conditional writ of habeas corpus as to the penalty phase of Boyde's trial.

## D

Boyde raises a number of other penalty phase errors, including serious due process issues. Because the district court should have granted the writ based on Boyde's ineffective assistance claims, we do not reach any of these arguments.

\*     \*     \*

We affirm the district court's decision to deny Boyde's petition for a writ of habeas corpus because of alleged errors in the guilt phase of his trial. We reverse its decision as to the penalty phase and remand for the district court to issue a writ of habeas corpus, unless within a reasonable time set by the district court the state conducts a new penalty phase trial or vacates Boyde's death sentence and imposes a lesser sentence consistent with law.

**AFFIRMED IN PART; REVERSED IN PART.**