**Gerald Bernard WHITE II, aka Pookie, Petitioner,**

v.

**Derrick OLLISON, Warden (A) Ironwood State Prison, Respondent.**

**Case No. CV 06–5210–DSF(RC).**

United States District Court, C.D. California.

Dec. 12, 2008.

Gerald Bernard White, II, Blythe, CA, pro se.

Carl N. Henry, CAAG–Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

DALE S. FISCHER, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the habeas corpus petition and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Dale S. Fischer, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

### BACKGROUND

#### I

On October 1, 2001, in Los Angeles County Superior Court case no. LA035538, a jury convicted petitioner Ger-

ald Bernard White II, aka Pookie, of one count of second degree murder in violation of California Penal Code ("P.C.") § 187(a), and found that, in the commission of the murder, petitioner personally used a firearm (shotgun) within the meaning of P.C. § 12022.5(a)(1) and personally and intentionally discharged a firearm (shotgun) within the meaning of P.C. § 12022.53(c); however, the jury found petitioner not guilty of first degree murder.[1] Clerk's Transcript ("CT") 380–81, 384–86. The petitioner was sentenced to state prison for the total term of 35 years to life. CT 387–90.

The petitioner appealed his conviction and sentence to the California Court of Appeal, CT 391, which in an unpublished opinion filed September 18, 2003, 2003 WL 22146429, modified the judgment by striking the enhancement under P.C. § 12022.5 (which the trial court had stayed), and affirmed the judgment as modified. Motion to Dismiss ("Motion"), Exh. B; Lodgment nos. 2–4. On October 28, 2003, petitioner, proceeding through counsel, filed a petition for review in the California Supreme Court, which denied the petition on December 10, 2003. Motion, Exhs. C–D.

■ On November 1, 2004, petitioner, proceeding pro se, filed a habeas corpus petition in the Los Angeles County Superior Court, which denied the petition on December 22, 2004. Motion, Exh. E at 125–26; Opposition to Motion to Dismiss ("Opposition"), Exhs. B–E. On March 24, 2005, petitioner filed a petition for writ of error coram nobis in the Los Angeles Superior Court, which denied the petition on June 27, 2005. Opposition, Exhs. H–I. On September 12, 2005, petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition on June 28, 2006, with citation to *In re Swain,* 34 Cal.2d 300, 304, 209 P.2d 793 (1949),[2] *People v. Duvall,* 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252 (1995),[3] and *In re Waltreus,* 62 Cal.2d 218, 42 Cal.Rptr. 9, 397 P.2d 1001 (1965).[4] Motion, Exhs. F–G.

## II

The California Court of Appeal, in affirming petitioner's conviction, made the

---

1. Petitioner was also charged with a gang enhancement under P.C. § 186.22(b)(1); however, the trial court granted petitioner's motion for acquittal of this charge under P.C. § 1118.1. CT 114, 344.

2. A citation to *In re Swain* may indicate two different things. The first meaning is that petitioner has not made allegations with sufficient particularity. *In re Swain,* 34 Cal.2d at 303–04, 209 P.2d 793; *Kim v. Villalobos,* 799 F.2d 1317, 1319 (9th Cir.1986). The second meaning is that the petitioner has failed to explain his delay in raising an issue. *In re Swain,* 34 Cal.2d at 304, 209 P.2d 793; *Washington v. Cambra,* 208 F.3d 832, 833 (9th Cir.), *cert. denied,* 531 U.S. 919, 121 S.Ct. 282, 148 L.Ed.2d 203 (2000).

3. A citation to *Duvall* stands for the proposition that the petitioner must "state fully and with particularity the facts on which relief is sought" and "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." *Duvall,* 9 Cal.4th at 474, 37 Cal.Rptr.2d at 265, 886 P.2d 1252; *Gaston v. Palmer,* 417 F.3d 1030, 1036–37 (9th Cir.2005), *amended by,* 447 F.3d 1165 (9th Cir.2006), *cert. denied,* 549 U.S. 1134, 127 S.Ct. 979, 166 L.Ed.2d 742 (2007).

4. "California's *In re Waltreus* rule provides that 'habeas corpus ordinarily cannot serve as a second appeal.' Thus, under the *In re Waltreus rule* the California Supreme Court will not review in a habeas petition any claim raised on direct appeal." *Hill v. Roe,* 321 F.3d 787, 789 (9th Cir.2003) (citation omitted); *In re Robbins,* 18 Cal.4th 770, 814 n. 34, 77 Cal.Rptr.2d 153, 182 n. 34, 959 P.2d 311 (1998); *In re Harris,* 5 Cal.4th 813, 825, 21 Cal.Rptr.2d 373, 377, 855 P.2d 391 (1993).

following factual findings:[5] At the time of the offense, the principal prosecution witness, Jessica Barahona, was Keith Jerro's girlfriend.[6] He was 16, she, 14. Barahona moved in with Jerro and his family after running away from a group home. She soon met petitioner, age 27, whom she knew by his nickname, "Pookie." Through her contemporary and best friend, Sandy Nammour, Barahona became acquainted with several members of the 18th Street Gang, who occupied an apartment on Sherman Way in Canoga Park. Their names and monikers were Edilberto Garcia (Loco), Edwin Becerra (Casper), and Gustavo Liera (Clown), the murder victim.[7] Barahona occasionally stayed over at the apartment when she was not getting along with Jerro.

Anthony King was a friend whom Jerro saw almost daily. Barahona testified that shortly before the March 27, 2000 shooting, she attended a party at King's home, at which she witnessed King and Jerro smoking marijuana and cleaning and loading a handgun.

In their relationship, Jerro physically abused Barahona, striking and tossing her whenever they argued, almost daily. On Sunday, March 26, 2000, Barahona called Jerro and said she no longer wanted to live with him, and wished to pick up her belongings. After an unsuccessful attempt to do so, she returned to the house of her friend Luke (Israel Luke Zamora) and retrieved a pager message from Jerro. Barahona phoned Sandy Nammour at the Sherman Way apartment, told her the situation vis-à-vis Jerro, and asked Nammour to make a "three-way" call to Jerro.[8] The call was completed, to petitioner's cellular (cell) phone—the number for which Barahona knew—and the couple agreed to meet, at Tommy's on Roscoe Boulevard, at about 2:00 a.m., March 27.

Barahona rode to the location with Zamora. Jerro arrived about 15 minutes later, in a small, dark-colored truck driven by petitioner. Both of them got out and told Barahona to get in. Petitioner was holding a handgun, which frightened Barahona and Zamora, but she got into the truck, sitting between petitioner and Jerro. Petitioner asked "who the fuck" Zamora was, and briefly pursued his vehicle, but Zamora escaped by turning off his lights.[9]

Inside the truck, Barahona smelled alcohol on petitioner's breath, as well as Jerro's, and believed petitioner to be drunk. Petitioner remained angry, and he asked Barahona who the 18th Street group were. Petitioner stated that when their number had appeared on the caller I.D. of his cell phone, he had called back, asking if she was there. Those who answered had disrespected petitioner, telling him their names were Casper and Loco, they were from the 18th Street gang and that he shouldn't call there. They had said, "fuck you, nigger," and "fuck your

---

5. *See* Motion, Exh. B at 2–9.

6. Although the information charged both petitioner and Jerro, Jerro's case was severed for trial. Motion, Exh. B at 2.

7. Gustavo Liera's brother Simon, who was not a gang member, also resided there. "Liera" refers to Gustavo.

8. Barahona and Nammour testified they frequently made calls in this fashion, for various reasons. In this instance at least part of the reason was to conceal that Barahona was at Zamora's.

9. Zamora's account was quite different. He testified he simply dropped off Barahona at a gas station on Roscoe, and never saw a black truck or felt pursued. Zamora was fearful about testifying, fearing retaliation in a criminal case.

neighborhood."[10] As petitioner drove, Jerro loaded bullets in the handgun. (Barahona initially testified he did so by turning a cylinder, but later stated he had loaded them in a square object.) Petitioner drove circuitously to the Sherman Way location; Barahona would not tell him how to get there, but Jerro had been there previously to pick her up.

Parking on Sherman Way, petitioner took a shotgun from behind the seat. He stuck it in his pants, along his left leg.[11] Petitioner then walked strangely, not straight but to the side. He and Jerro proceeded inside the apartment building, where Liera and his roommates resided in a second floor apartment, bearing "18th" markings on the walls. Before entering, however, petitioner returned to the truck and retrieved a beanie, which he put on, stating he had forgotten it. Although afraid, Barahona did not leave because she feared petitioner would come after her and harm her. Her fear stemmed from his drunken state, the gun, and her belief that he was a gang member.

After several minutes, Jerro emerged from the building and jogged to the truck. Barahona then saw petitioner come out, together with Liera, who had no shirt on. (Liera had recently left the apartment, saying he was going outside to meet some girls.) Petitioner held the shotgun to Liera's side and screamed that he should look not at petitioner but at the ground. Petitioner walked Liera to a grassy area in front of the building. Liera lay down, between two palm trees, and petitioner fired the shotgun in his direction. Petitioner then shouted again that Liera should keep his head down, not look at him, and not get up. Still yelling this, petitioner returned to the truck, opened the driver's door partly, and fired in Liera's direction again. After the shot, petitioner once more shouted, "Stay down." Barahona heard Liera screaming for "Edwin" or "Eddie."[12]

After some difficulty, petitioner found his keys and started the truck. As it rolled away, Jerro, his arm pointed out the truck window and toward the building, began firing his handgun. He continued to do so, pointing toward the palm trees, as petitioner drove away. As Barahona described it, the shots came all at once, one after another.

Driving, petitioner said, "I should have smoked him." Petitioner averred that he knew from Liera's voice that he was not the same person as had insulted him on the phone; otherwise he would have shot and killed him. Petitioner added that he was going to get more bullets and come back. He indicated that he did not believe anyone had been shot.

Petitioner placed a beanie over Barahona's eyes, telling her he did not want her to know where he lived. He also said he would kill her if she said anything. After 10 or 15 minutes, petitioner stopped the

---

**10.** At trial, Garcia confirmed that he had received a call that evening asking for Barahona. After stating she wasn't there, he had used the "N-word" because the caller had demonstrated an attitude. Thereafter, two more calls had come in. Becerra had answered them and had become increasingly irritated.

**11.** Petitioner was five feet, 9 inches tall. Barahona at first estimated the length of the shotgun as about 32 inches. When subse-

quently shown a 48-inch shotgun that had been seized from petitioner's stepfather's home, she stated that it could have been the same one as petitioner had put in his pants leg.

**12.** Garcia testified that, upstairs in the apartment, he heard Liera's screams, as well as the shots, but did not hear anyone else yelling. Garcia went downstairs and found Liera with his shirt beside him. Liera said he had been shot by "These two bad guys."

truck. The three got into his Camry, in which Barahona had previously ridden.[13] She ended up at Jerro's home, but later left. Barahona was subsequently interviewed by police, and her videotaped interview and its transcripts were used, in part, to refresh her recollection and for impeachment.

Paramedics arrived at the crime scene at about 3:30 a.m., and found Liera with multiple gunshot wounds, including one in the lower back. He was conscious but spoke with difficulty. In surgery on March 28, 2000, an expended slug was removed from his lower pelvic area. Liera died on April 17, 2000. The coroner's office determined the cause of death to have been multiple gunshot wounds, with three entrance wounds in the chest and midline, each fatal. All were consistent with a high-powered or 9 millimeter handgun.

On March 30, 2000, Los Angeles Police Detective David Szabo arrested Jerro and his friend King at the latter's Northridge home, pursuant to warrants. Jerro had four rounds of 9 millimeter ammunition in his pocket. Inside the house, Detective Szabo recovered a loaded Browning 9 millimeter handgun, another loaded 9 millimeter Smith and Wesson handgun, loaded magazines, and several boxes of 9 millimeter ammunition. The Browning was polished and lighter in color than the Smith and Wesson, and when interviewed by police Barahona stated it was the one Jerro had used in the shooting. On March 31, 2000, in Lakeview Terrace, Detective Szabo located a small black Toyota pickup

truck, which had two expended 9 millimeter casings in its bed, and also a green Camry.[14]

Los Angeles Police Department firearms examiner Starr Sachs examined a dozen 9 millimeter cartridge cases that had been recovered at the crime scene, and test-fired the Browning handgun. He determined that it had fired the cartridges, as well as a bullet jacket fragment also found at the crime scene. The deformed lead slug extracted from Liera had impressions consistent with the jacket fragment. A 12–gauge shotgun shell found at the crime scene, about 80 feet from the victim's location, was compatible with the shotgun seized at petitioner's stepfather's house, but that weapon produced insufficient markings to determine whether it had fired a particular shell.

Barahona testified that Jerro constantly doodled and tagged the letters "M.O.T.," which she believed to be a gang he was in. She understood the term Moteros to mean marijuana smokers. Regarding her understanding concerning petitioner's gang connection, at trial Barahona neither recalled nor had her recollection refreshed by what she had said in the police interview. The prosecutor thereafter read Barahona's interview statement, in response to a police question about petitioner's gang affiliation, that petitioner had "said he was with Pacoima Pirus . . . but that now he is from Old—or something."

Los Angeles Police Officer Wilfredo Ortiz, assigned to gang enforcement in the San Fernando Valley, collected intelligence on gangs, their members, culture, habits,

---

13. Barahona had attended a party at Palmdale with petitioner and Jerro a few weeks before. Driving the Camry on the way back, petitioner had swerved and could not keep control of the car. She believed him to be drunk.

14. During the initial investigation, police were unable to determine who "Pookie" was. They had Barahona's friend Nammour examine gang photographs of persons with that moniker, and she identified someone other than petitioner as looking like the "Pookie" she knew.

rivalries, and alliances. He testified that gangs engage in criminal activity to intimidate the community or enhance the gang. Members join by committing crimes or being physically recruited ("jumped"), and receive monikers, which identify them as members. They move up by committing crimes, including killing in retaliation for problems with outsiders. In this connection, an attempted murder would enhance prestige or enable one to join.

Officer Ortiz testified he had known four or five gang members who used the moniker "Pookie." "Payback" involves committing two killings in retaliation for one by the other gang, and a shooting in response to a verbal insult would constitute a similarly escalated retaliation. For years, Officer Ortiz had stayed in close contact with the Pacoima Pirus, a predominantly African–American subset of the Bloods. The 18th Street gang was largely Hispanic.[15] Ortiz testified that gang conflict generally occurs between gangs, not ethnicities, but that in prison African–Americans and Hispanics separate by race. However, sometimes such racial tensions spill over outside, and create "wars out on the street." In Los Angeles, such tensions had been very high at the time of the offense; they had since declined.

In response to a question hypothesizing the present shootings, by a professed Pacoima Piru and an M.O.T. tagger, following a phone conversation with self-identified 18th Street members that included use of the "N-word," Officer Ortiz opined that the shooting would be a gang shooting, for the benefit of the gang, in that it would elevate the African–American shooters over the other gang and its Hispanics.

After defining a drive-by shooting as one in which a driver and one or two passengers yell out "Where you from?" and their gang name while driving, and then begin shooting, Officer Ortiz was asked whether the portion of the hypothetical shooting that took place from the moving vehicle included aspects of a drive-by. He responded that the shooting had started as a drive-by, when the truck arrived, but had then become a "walk-up." But he was unaware of any name being called out as petitioner drove. Officer Ortiz also identified records of convictions of two Pacoima Pirus members, for cocaine possession or sales. He admitted, however, that those offenses were unconnected with petitioner. Moreover, as an expert in the Pacoima Pirus, Officer Ortiz had never heard of petitioner before this case, and he was not listed in any gang book of which the officer was aware. He had examined books reflecting all police-member contacts within the last five years in various areas of Los Angeles.

Petitioner's defenses were voluntary intoxication and that he had had no involvement in the fatal events besides driving Jerro, who he had not known intended to shoot at Liera. Petitioner contended that Barahona's testimony was largely false.[16] Petitioner called family members, including his mother, stepfather, and two stepbrothers, who testified to his nonviolent character, lack of previous arrests, and record as a good student and caring son and sibling. Petitioner's mother testified she had given him the nickname "Pookie," which another member of her family also used, on the day he was born. She also stated he was not a heavy drinker, but acknowledged that as a security guard he

---

**15.** Petitioner and Jerro were African–American; Barahona and her friends were Hispanic.

**16.** In his summation, petitioner's counsel argued: "If you believe Jessica Barahona, then you're going to convict my client, but if you don't believe Jessica Barahona ... you're going to acquit my client."

owned a .22 caliber gun. On cross-examination, petitioner's stepfather, whose shotgun had been introduced in evidence, testified he had not denied owning a shotgun when police searched his house. It was then stipulated that a Los Angeles sheriff's deputy would testify that when he gave consent to search, the stepfather had said he had many guns but not a shotgun.

## III

On August 14, 2006, petitioner, proceeding pro se, filed the pending petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction and sentence.[17] On October 17, 2007, this Court denied respondent's motion to dismiss the petition as untimely. *White v. Ollison,* 530 F.Supp.2d 1077 (C.D.Cal.2007). On February 26, 2008, respondent answered the petition, and petitioner filed his reply on July 31, 2008.

Petitioner's habeas corpus petition raises the following eleven claims:

Ground One—(1) Ineffective assistance of trial counsel, who: (a) "did not present petitioner with discovery evidence (transcripts of all witness interviews with police)"; (b) "advised petitioner to invoke his [Fifth] Amendment right to remain silent while being accused of acts petitioner wasn't even [a] witness to"; (c) "neglected to effectively cross-examine the descriptive testimony of prosecution witness Jessica Barahona and failed to raise questions requested by petitioner"; and (d) "ineffectively concurred to a 4–year firearm use enhancement that should have been objected to during the sentencing of petitioner"; and, (2) ineffective assistance of appellate counsel, who "should have ... brought

[these errors] to the court's attention ... on direct appeal." (Petition at 5);

Ground Two—"Petitioner's conviction was obtained in violation of his rights to due process, confrontation and compulsory process under the U.S. Constitution in that trial counsel failed to develop and present the defense of petitioner's claims of actual innocence." (*Id.*);

Ground Three—"Petitioner's second degree murder conviction should be reversed in that it was obtained in violation of petitioner's rights to due process and equal protection under the U.S. Constitution in that the record does not contain substantial evidence to support a finding that petitioner knew co-defendant Keith Jerro would aim and shoot his weapon at Gustavo Liera and intended to aid and abet that purpose." (*Id.* at 6);

Ground Four—"Petitioner's conviction was obtained in violation of his rights to due process and an impartial jury under the U.S. Constitution in that the trial court committed reversible error by admitting evidence that petitioner was a gang member." (*Id.*);

Ground Five—"Petitioner's conviction was obtained in violation of his rights to due process, an impartial jury, and equal protection of the law under the U.S. Constitution in that irrelevant gang evidence was admitted by the court at trial." (*Id.* at 5a);

Ground Six—"Petitioner's conviction was obtained in violation of his rights to due process and equal protection under the U.S. Constitution in that the trial court improperly instructed the jury." (*Id.*); and

---

**17.** On December 2, 2004, petitioner filed a prior habeas, which was dismissed without prejudice on January 21, 2005, due to petitioner's failure to exhaust his state court remedies. *White v. Scribner,* CV 04–9798–DSF(RC) ("White I"). Pursuant to Fed. R.Civ.P. 201, this Court takes judicial notice of the documents in White I.

Ground Seven—"Petitioner's conviction was obtained in violation of his rights to due process and equal protection under the U.S. Constitution in that the trial court erred in imposing and staying the Section 12022.5, subdivision (a), personal firearm use enhancement." (*Id.*).

## DISCUSSION

## IV

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade*, 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under AEDPA, a federal court shall presume a state court's determination of factual issues is correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ The California Supreme Court reached the merits of Grounds Three through Six when it denied petitioner's petition for review without comment or citation to authority. *Pinholster v. Ayers*, 525 F.3d 742, 756 n. 11 (9th Cir.2008); *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir.1992), *cert. denied*, 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). "Where there has been one reasoned judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir.2007) (en banc), *cert. denied*, —— U.S. ——, 128 S.Ct. 1878, 170 L.Ed.2d 754 (2008). Thus, in addressing Grounds Three through Six, this Court will consider the reasoned opinion of the California Court of Appeal, which denied these claims on the merits.[18] *Butler v. Curry*, 528 F.3d 624, 640 (9th Cir.2008); *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir.2008). Likewise, this Court will consider the California Court of Appeal's opinion in addressing Ground Seven, *ibid.*, and the Los Angeles County Superior Court's opinion in addressing Grounds One and Two.[19] *Bonner v. Carey*, 425 F.3d 1145,

---

**18.** The petitioner raised Grounds Three through Seven on appeal to the California Court of Appeal, and raised Grounds Three through Six in his petition for review to the California Supreme Court. *See* Lodgment no. 2, Motion, Exh. C. Thus, the California Supreme Court's citation to *Waltreus* in denying review, requires this Court to "look through" the *Waltreus* denial to the last explained state court decision, *Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir.), *cert. denied*, 519 U.S. 832,

117 S.Ct. 101, 136 L.Ed.2d 55 (1996), which is the California Court of Appeal's opinion.

**19.** A citation to *Waltreus* does not apply to claims of ineffective assistance of counsel, which petitioner raises in Grounds One and Two. *Robbins*, 18 Cal.4th at 814 n. 34, 77 Cal.Rptr.2d at 182 n. 34, 959 P.2d 311. Rather, the citations to *Swain* and *Duvall* apply to these claims, meaning petitioner failed to set forth these claims with sufficient particulari-

1148 n. 13 (9th Cir.2005), *amended by,* 439 F.3d 993 (9th Cir.), *cert. denied,* 549 U.S. 856, 127 S.Ct. 132, 166 L.Ed.2d 97 (2006).

**V**

■ "Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants." *Deakins v. Monaghan,* 484 U.S. 193, 199, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988); *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). "[F]ederal courts may not 'give opinions upon moot questions or abstract propositions.'" *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 2067, 135 L.Ed.2d 453 (1996) (per curiam) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). "This means that, throughout the litigation, the [petitioner] 'must have suffered, or be threatened with, an actual injury traceable to the [respondent] and likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990)); *see also Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam) ("In general, a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (citations and internal quotation marks omitted)).

In Ground Seven,[20] petitioner claims he was denied due process and equal protection of the law when the trial court imposed a personal firearm enhancement under P.C. § 12022.5(a). However, on appeal, the California Court of Appeal "modif[ied] the judgment by striking the enhancement under [P.C.] section 12022.5." Motion, Exh. B at 18. Thus, petitioner is not subject to a sentence enhancement under P.C. § 12022.5, and any claim related to the enhancement is moot. *See Caswell v. Calderon,* 363 F.3d 832, 837 (9th Cir.2004) (habeas corpus claim moot when court could not provide petitioner with any effective relief); *United States v. Kraus,* 137 F.3d 447, 452 (7th Cir.1998) (defendant's challenge to sentence enhancement was moot when conviction and sentence vacated on appeal).

**VI**

■ To review the sufficiency of evidence in a habeas corpus proceeding, the Court must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 3102–03, 111 L.Ed.2d 606 (1990) (citation omitted); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). All evidence must be considered in the light most favorable to the prosecution, *Jeffers,* 497 U.S. at 782, 110 S.Ct. at 3103; *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, and if the facts support conflicting infer-

ty. Respondent contends, however, that the citations to *Swain* and *Duvall* mean petitioner has procedurally defaulted Grounds One and Two. However, since these grounds are clearly without merit, this Court will not address the alternate procedural default argument. *Franklin v. Johnson,* 290 F.3d 1223, 1232 (9th Cir.2002); *see also Barrett v. Acevedo,* 169 F.3d 1155, 1162 (8th Cir.) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dic-

tates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."), *cert. denied,* 528 U.S. 846, 120 S.Ct. 120, 145 L.Ed.2d 102 (1999).

20. For convenience, the Court addresses Ground Seven first, and the ineffective assistance of counsel claims (Grounds One and Two) last.

ences, reviewing courts "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793; *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir.2004) (per curiam); *Turner v. Calderon*, 281 F.3d 851, 882 (9th Cir.2002). Furthermore, under AEDPA, federal courts must "apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1142, 1145, 163 L.Ed.2d 1000 (2006). These standards are applied to the substantive elements of the criminal offenses under state law. *Jackson*, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16; *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir.) (en banc), *cert. denied*, 543 U.S. 956, 125 S.Ct. 415, 160 L.Ed.2d 318 (2004).

██ Under California law, "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." *People v. Knoller*, 41 Cal.4th 139, 151, 59 Cal.Rptr.3d 157, 166, 158 P.3d 731 (2007); *People v. Nieto Benitez*, 4 Cal.4th 91, 102, 13 Cal.Rptr.2d 864, 869, 840 P.2d 969 (1992).[21] "Malice, for the purpose of defining murder, may be express or implied." *Nieto Benitez*, 4 Cal.4th at 102, 13 Cal.Rptr.2d at 870, 840 P.2d 969; *Knoller*, 41 Cal.4th at 151, 59 Cal.Rptr.3d at 166, 158 P.3d 731; P.C. § 188. Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied[ ] when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." P.C. § 188. When it is established that a killing was the result of an intentional act committed with express or implied malice, "no other mental state need be shown to establish the mental state as malice aforethought." *Id.*

██ "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages, or instigates the commission of the crime." *People v. Cooper*, 53 Cal.3d 1158, 1164, 282 Cal.Rptr. 450, 455, 811 P.2d 742 (1991); *People v. Richardson*, 43 Cal.4th 959, 1023, 77 Cal.Rptr.3d 163, 214, 183 P.3d 1146 (2008).[22] The intent to render such aid

---

**21.** At the time of petitioner's conviction, P.C. § 189 provided, in pertinent part:

All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.

P.C. § 189 (2001).

**22.** At the time of petitioner's conviction, P.C. § 31 provided:

All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age

must be formed prior to or during the commission of the crime. *Cooper*, 53 Cal.3d at 1164, 282 Cal.Rptr. at 455, 811 P.2d 742; *People v. Beeman*, 35 Cal.3d 547, 558, 199 Cal.Rptr. 60, 66–67, 674 P.2d 1318 (1984). Furthermore, to convict a defendant as an aider and abettor under the "natural and probable consequences" doctrine, the trier of fact must also find the defendant's confederates committed an offense (non-target crime) other than the target crime, and the offense committed was a natural and probable consequence of the target crime the defendant aided and abetted. *People v. Williams*, 43 Cal.4th 584, 636, 75 Cal.Rptr.3d 691, 735, 181 P.3d 1035 (2008); *People v. Mendoza*, 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428, 433, 959 P.2d 735 (1998). "The ... question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." *Mendoza*, 18 Cal.4th at 1133, 77 Cal.Rptr.2d at 440, 959 P.2d 735 (emphasis in original). A person may be convicted of murder based on his status as an aider and abettor. *Spivey v. Rocha*, 194 F.3d 971, 976–77 (9th Cir.1999), *cert. denied*, 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000); *People v. Woods*, 8 Cal.App.4th 1570, 1583–84, 11 Cal.Rptr.2d 231 (1992).

■ In Ground Three, petitioner claims there was insufficient evidence he knew "Keith Jerro would aim and shoot his weapon at Gustavo Liera and intended to aid and abet that purpose." [23] The Cali-

fornia Court of Appeal denied this claim, holding:

> In the present case, although both [petitioner] and Jerro discharged firearms in the victim's direction, the shots that struck and killed him were fired by Jerro. [Petitioner's] liability, if any, was thus as an aider-abetter of Jerro's shooting. [Petitioner] contends, however, that there was no substantial evidence of two primary qualifications for aider-abetter status: that he knew that Jerro would shoot, and that he intended to aid that conduct. We cannot agree. [¶] The evidence showed that [petitioner] drove Jerro and himself to the Sherman Way location, bent on committing assault with a firearm upon at least one of its occupants who had recently denounced him on the telephone. [Petitioner] had a shotgun in his truck, and it also carried the 9 millimeter, which [petitioner] first displayed to Barahona and Zamora, and Jerro then loaded while seated with [petitioner] and Barahona. Upon arrival at the apartments, both [petitioner] and Jerro entered the building armed, and [petitioner] emerged with Liera, whom he repeatedly assaulted with the shotgun, first by holding it against him and then by firing it in his direction, twice. Moments later, Jerro fired the other weapon in that direction, completing the offenses and fatally wounding Liera. From the direct evidence of these facts that Barahona provided, the jury had ample basis to find

of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed.

P.C. § 31 (2001).

**23.** Although petitioner attempts to raise his sufficiency of the evidence claim under both

the due process and equal protection clauses, petitioner's claim is properly brought only as a due process challenge. *Jeffers*, 497 U.S. at 781, 110 S.Ct. at 3102; *Jackson*, 443 U.S. at 316, 99 S.Ct. at 2787. In several of petitioner's other grounds for relief, petitioner likewise attempts to cite inapplicable constitutional provisions, and this Court summarily rejects these claims.

that [petitioner] and Jerro mutually harbored the intent to shoot at the victim, and that [petitioner] knew that Jerro shared that intent. [¶] In contending to the contrary, [petitioner] points to circumstances arguably consistent with the hypothesis that [petitioner] did not intend that Liera be fatally shot, such as [petitioner's] own missed shots, his commanding Liera not to look at him, and his subsequent statement that he would have killed the person who had insulted him. But this line of argument eludes the issue. Even if [petitioner] did not specifically intend to kill Liera, the jury was entitled to find that his death was the result of a second degree murder by Jerro—grounded in either express malice or implied malice as manifested by the firing of 12 shots—and that this murder was the natural and probable consequence of an assault with a firearm (or a violation of [P.C.] section 246) [24] that [petitioner] aided and abetted, by transporting the armed Jerro, with knowledge of his assaultive intent, as well as by personally shooting at the victim.

\* \* \*

Whether or not [petitioner] intended to kill Liera, the jury could properly have found that he aided and abetted Jerro's shooting at the victim, and that the resulting murder was a natural and probable consequence of that felonious conduct.

Motion, Exh. B at 10–12 (citations omitted; footnote added).

The testimony of a single witness is sufficient to uphold a conviction, *Bruce,* 376 F.3d at 957–58, and a federal court in a habeas corpus proceeding cannot redetermine the credibility of witnesses whom the federal court has not observed. *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). Rather, "[t]he reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Jones v. Wood,* 114 F.3d 1002, 1008 (9th Cir.1997) (quoting *Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995)).

Here, as the California Court of Appeal found, there was ample evidence from which the jury could determine petitioner knew Jerro would shoot and intended to aid the shooting. Specifically, the jury heard evidence that Barahona used to live with Jerro, Reporter's Transcript ("RT") 2782:26–2783:3, 2793:5–17, who was abusive to her, RT 2807:1–2808:23, and she knew several members of the 18th Street gang who lived in an apartment on Sherman Way (the "Sherman Way apartment"), where Barahona sometimes stayed when she was not getting along with Jerro. RT 2786:27–2787:27–2790:16, 2814:17–2816:5. Before the murder, Barahona called Jerro to tell him she wanted to get her belongings and move out, and they agreed to meet at Tommy's on Roscoe so Jerro would not know where Barahona was staying. RT 2809:5–2817:4, 3017:11–

24. At the time of petitioner's conviction, P.C. § 246 provided, in pertinent part:

Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, [or] occupied building, ... is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for three, five, or seven years, or by imprisonment in the county jail for a term of not less than six months and not exceeding one year. [¶] As used in this section, "inhabited" means currently being used for dwelling purposes, whether occupied or not.

P.C. § 246 (2001).

3022:22. Barahona made this arrangement with Jerro on a three-way call involving her friend, who was at the Sherman Way apartment. RT 3022:23–27. Barahona and another friend drove to Tommy's, where they waited for Jerro. RT 3028:17–22. Petitioner and Jerro arrived at Tommy's in a truck with petitioner driving, petitioner and Jerro exited the truck with petitioner holding a handgun, and Jerro ordered Barahona to get inside their vehicle, which she did, sitting between petitioner and Jerro. RT 3031:20–3035:12, 3044:13–3047:17, 3054:10–3056:3, 3061:2–4. After briefly chasing the vehicle Barahona's friend was driving, petitioner drove Barahona to the Sherman Way apartment, telling her he had called the Sherman Way apartment and the 18th Street gang members he had spoken with—"Casper" and "Loco"—"disrespected" him. RT 3065:27–3084:22. As petitioner drove, Jerro loaded the handgun, and there was nothing to obstruct petitioner's view of what Jerro was doing. RT 3084:23–3091:7. When they arrived at the Sherman Way apartment, petitioner stopped the truck, got a shotgun from the back of the vehicle, and petitioner and Jerro entered the apartment building. RT 3092:1–3094:1, 3106:12–28, 3135:2–3138:22, 3147:14–3148:3, 3316:3–5. Shortly afterward, Jerro exited the apartment building and ran back to the truck, followed approximately two or three minutes later by Liera and petitioner, who was pointing a shotgun at Liera and repeatedly screaming at Liera "Don't look at me, motherfucker." RT 3319:7–3325:13, 3333:21–3334:2, 3400:19–3402:6. Petitioner then walked Liera over to some trees, Liera laid down on the ground, and petitioner fired the shotgun twice at Liera and yelled at Liera to keep his head down. RT 3325:14–3328:25, 3331:2–3338:26, 3390:23–3392:22. Petitioner then walked back to the truck, got inside and drove away from the apartment building while Jerro fired at least 10 shots at Liera, striking Liera at least three times in the abdomen and ultimately killing him. RT 3385:9–14, 3403:10–3407:28, 3414:14–3415:9, 4803:27–4804:15, 4804:28–4806:3, 4856:8–18, 5131:15–5134:19, 5140:25–5142:10, 5153:11–5161:18. As they were driving away from the shooting, petitioner stated he "should have smoked [Liera,]" and "they were going to get more bullets and . . . come back." RT 3418:13–3419:13.

This evidence is more than sufficient to support petitioner's second degree murder conviction. *Windham v. Merkle,* 163 F.3d 1092, 1102 (9th Cir.1998); *People v. Gonzales,* 87 Cal.App.4th 1, 10–11, 104 Cal. Rptr.2d 247 (2001). Accordingly, the California Supreme Court's denial of Ground Three was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VII

Under very narrow circumstances, the misapplication of state evidentiary rules may violate federal due process safeguards. *Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102; *Ortiz v. Stewart,* 149 F.3d 923, 941 (9th Cir.1998), *cert. denied,* 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999). However, to warrant federal habeas relief, a state court's evidentiary ruling must have "so fatally infected the proceedings as to render them fundamentally unfair." *Dubria v. Smith,* 224 F.3d 995, 1001 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001); *Gonzalez v. Knowles,* 515 F.3d 1006, 1011 (9th Cir.2008). In the context of a claim of improperly-admitted evidence, "[a] writ of habeas corpus will be granted . . . only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and

take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir.2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 3398, 77 L.Ed.2d 1090 (1983)). In other words, "[o]nly if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process." *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir.2003) (emphasis in original); *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.2005), amended by, 421 F.3d 1154 (9th Cir.2005). "Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991) (citation omitted); *Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir.2006).

■ In Grounds Four and Five, petitioner claims he was denied due process of law when the trial court admitted evidence he was a gang member. Petitioner's claims are without merit.

On appeal, the California Court of Appeal set forth the factual basis for these claims:

> Given th[e gang enhancement] allegation, some evidence regarding gangs was necessarily relevant. Before trial, however, [petitioner] joined in a written motion by Jerro (whose case had not yet been severed) to preclude admission of gang membership evidence, while the prosecution filed a memorandum supporting its admission, with an offer of proof, similar to Officer Ortiz's opinion testimony at trial. The court held an evidentiary hearing, to determine whether the enhancement should be bifurcated and the evidence supporting it postponed until after trial of the offense, or whether gang-related evidence should be admitted because relevant to other issues in that trial as well. [¶] At the hearing, the prosecutor argued that the gang evidence was relevant to issues of

motive and intent, and to a lesser degree to identity and "witness credibility." The prosecutor explained that she would offer evidence that [petitioner] was a member of the Pacoima Pirus, a Bloods gang, that the victim was a member of the Hispanic 18th Street gang, and that there existed racial gang animosity, on top of which [petitioner] had been severely insulted by use of "the N word" in a phone call from the Sherman Way apartment. Together, these factors had generated the motive for the assaults, during which the victim's shirt had been removed so as to disclose his gang tattoos. Jerro, himself an aspiring gang member, had accompanied [petitioner]. The prosecution's gang expert would also testify about gang retaliation by shootings, as well as the frequent appearance of [petitioner's] nickname Pookie as a gang moniker. [¶] [Petitioner] presented testimony disputing the premise that he was a gang member. Members of his family testified he was not, and recounted the family derivation of his nickname. Friends with whom [petitioner] played rap music gave an innocent account of a set of photographs the prosecutor offered, depicting [petitioner] with orange attire and displaying a hand sign (which actually was not associated with the Pirus). A reserve police officer who managed [petitioner's] apartment building and saw him frequently recounted observing no gang behavior by or visitors to [petitioner]. [Petitioner] also called Officer Ortiz, the prosecution's gang expert. He testified most prominently that [petitioner] was not listed in police gang records, for the Pacoima Pirus or otherwise, and that his claim of membership, such as Barahona had recounted, would not be enough to identify him as a member, without it having been communicated by a reliable informant. [¶] [Petitioner] argued that

the evidence of his gang membership was so slight as to render unduly prejudicial admission of either it or other gang evidence, which would invariably taint him. The prosecutor responded that the evidence was significant to motive, and that the claimed slimness of the showing that [petitioner] was a gang member—essentially Barahona's account—would minimize its prejudice. [¶] The trial court concluded that gang evidence would be admissible in the prosecution's case, as relevant to motive, intent, premeditation, deliberation, identity, and credibility (should [petitioner] testify). In so ruling, the court stated that its function was not to determine the question of [petitioner's] gang membership, by weighing his witnesses' credibility against Barahona's. Rather, [petitioner's] evidence did not negate the existence and potential weight of Barahona's report that [petitioner] had said he was with the Pacoima Pirus. That evidence would be particularly probative of motive, and the presence of an overlapping motive involving the racial insult did not deprive it of such significance. Considering also the fact that the victim was a gang member and had been laid out with his gang tattoos exposed, the court concluded, having weighed all of [petitioner's] evidence too, that the probative value of the proposed evidence, from Barahona and the gang expert, "greatly outweighs the prejudice in its introduction." However, the court excluded, as confusing and insufficiently probative, the photographs of [petitioner] allegedly making gang signs.

Motion, Exh. B at 14–16 (footnote omitted).

 The California Court of Appeal then found the trial court abused its discretion in admitting the gang evidence,[25] but petitioner was not prejudiced, stating:

[W]e do not believe that the allowance of gang evidence either denied [petitioner] a fair trial or engendered a miscarriage of justice under Article VI, section 13 of the California Constitution.[26] (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).[27] The evidence of [peti-

---

25. Abuse of discretion is not a basis for habeas corpus relief. *See Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."); *Williams v. Borg*, 139 F.3d 737, 740 (9th Cir.) (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion."), *cert. denied*, 525 U.S. 937, 119 S.Ct. 353, 142 L.Ed.2d 292 (1998).

26. Article 6, § 13 of the California Constitution provides, in pertinent part:

No judgment shall be set aside, or new trial granted, in any cause, on the ground of ... improper admission or rejection of evidence ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

Cal. Const. Art. 6, § 13.

27. As the Ninth Circuit has explained:

The *Watson* harmless error standard is the standard applied by the California state appellate courts in reviewing non-constitutional magnitude, trial type errors. In applying the *Watson* standard, California state appellate courts determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." This standard under California state law is the equivalent of the *Brecht* standard under federal law....

*Bains v. Cambra*, 204 F.3d 964, 971 n. 2 (9th Cir.) (citations omitted), *cert. denied*, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000). Under *Brecht*, a non-structural error does not trigger habeas corpus relief unless the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S.

tioner's] membership was not strong, and Officer Ortiz rebutted it. Moreover, the gang evidence did not supply a missing element with respect to motive and intent: there were far more clearly documented motives for both [petitioner's] and Jerro's behavior. [¶] **The possibility or degree of prejudice was also diminished by the court's excision of the gang enhancement charge before the case was submitted to the jury. The jury was instructed no longer to consider that allegation,** and the prosecutor's closing arguments made little reference to the gang evidence. Although the prosecutor briefly alluded to it as additional indication of motive, she also stated, "[T]he gang allegation, which is no longer before you, is not the focus of this case. We have a dead body. It's a murder case. That's the focus of this case." (RT 5800)[¶] Nor did the jury's two days' deliberation (following substitution of an alternate), and its request for readback of testimony, signal that the gang evidence was influential. The verdict with respect to the degree of the offense, and the deliberations, indicate careful scrutiny of the merits. In sum, [petitioner] was not denied a fair trial by reason of the gang evidence, and there is no reasonable probability that absent its admission he would have achieved a more favorable result.

Motion, Exh. B at 18 (emphasis added).

The petitioner has not shown he was denied due process of law since, as the California Court of Appeal found, the gang evidence, though weak, was relevant to petitioner's motive and intent. *See Boyde,* 404 F.3d at 1173 ("[T]he fact that the prosecutor had strong evidence to prove that [petitioner] had committed the robbery does not mean the jury should not hear other evidence."); *Windham,* 163 F.3d at 1104 (admission of evidence of gang involvement did not violate petitioner's right to due process where it was relevant to motive). In any event, the only gang evidence against petitioner was Barahona's statement, which she could not remember at trial, that petitioner had once said "he was with Pacoima Pirus" and "now he is from Old—or something[,]" *see,* e.g., RT 3649:7–26, and Officer Ortiz's expert testimony, RT 4875:12–4899:24, which the defense effectively rebutted on cross-examination when Officer Ortiz testified he had no record of petitioner being a gang member. RT 4896:27–4898:6, 4899:18–21. Other testimony also rebutted the claim that petitioner was a gang member: petitioner's landlord, a minister and reserve policeman who lived next door to petitioner, who testified petitioner did not engage in gang activity or apply gang graffiti either inside or outside his apartment, RT 5413:12–5420:13; and petitioner's mother's, who testified she nicknamed petitioner "Pookie" when he was born, and that the nickname had nothing to do with gangs. RT 5426:13–5431:18. Furthermore, as the Court of Appeal noted, the trial court, at the close of evidence, granted petitioner's motion for acquittal on the gang allegation and instructed the jury not to consider it.[28] CT 344, 378; RT 5701:19–5707:6, 6059:8–25. In light of these factors, petitioner cannot demonstrate the trial court's admission of the gang evidence, even if erroneous, prevented him from receiving a fair trial. *Hovey,* 458 F.3d at 923; *Jammal,*

750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

**28.** "A jury is presumed to follow its instructions." *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000); *Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).

926 F.2d at 920. As such, the California Supreme Court's denial of Grounds Four and Five was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VIII

 A faulty jury instruction will constitute a violation of due process only where the instruction by itself so infected the entire trial that the resulting conviction violates due process. *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004); *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). The instruction must be more than merely erroneous; rather, petitioner must show there was a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.' " *McNeil*, 541 U.S. at 437, 124 S.Ct. at 1832 (citations omitted); *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *see also Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used, it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72, 112 S.Ct. at 482 (citation omitted); *Naughten*, 414 U.S. at 147, 94 S.Ct. at 400.

 In Ground Six, petitioner claims he was denied due process of law when the trial court improperly instructed the jury with CALJIC no. 3.02 (aider and abetter instruction), which provides:

> One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of Assault with a Firearm, Penal Code Section 245(a)(2) or the crime of Shooting at an Inhabited Dwelling, Penal Code Section 246, was committed; [¶] 2. That the defendant aided and abetted one of those crimes; [¶] 3. That a co-principal in that crime committed the crimes of Assault with a Firearm or Shooting at an Inhabited Dwelling; and [¶] The crime of murder was a natural and probable consequence of the commission of the crime[ ] of Assault with a Firearm or the crime of Shooting at an Inhabited Dwelling. [¶] You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of that target crime. [¶] Whether a consequence is "natural and probable" is an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A "natural consequence" is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing

unusual has intervened. [¶] "Probable" means likely to happen.

CT 366. Petitioner contends that the giving of this instruction "effectively omitted" malice aforethought by allowing the jury to find him guilty of murder if he aided and abetted an assault with a firearm, and the murder was the natural and probable consequence of that crime. There is no merit to this claim, as the California Court of Appeal found:

First announced in *People v. Ireland* (1969) 70 Cal.2d 522, 538–540 [75 Cal. Rptr. 188, 450 P.2d 580], the "merger" doctrine is an exception, in the case of assault, to the felony-murder rule that a killing caused by a felony inherently dangerous to life constitutes second degree murder, without further proof of malice aforethought, which is imputed by reason of the commission of the felony. The doctrine's rationale is that the great majority of homicides arise from felonious assaults, and therefore to presume malice and impart second degree felony murder would "usurp most of the law of homicide," by relieving the prosecution of the burden of proving malice, and would frustrate the Legislature's differentiation of homicides committed with or without it. [¶] [Petitioner] contends that felonious assault should not be allowed to serve either as a basis for felony murder or as the target crime through which an aider-abetter may become liable for a murder that is a natural and probable consequence. [Petitioner] basically claims that it is "irrational" to impute malice to an aider-abetter when that cannot be done to the principal, and, conversely, that the aider-abetter should not suffer conviction without proof of the malice that must be shown with respect to the principal. [¶] The primary answer to these arguments is that the felony-murder rule and the doctrine of aider-abet-

ter liability for offenses committed as a natural and probable consequence of offenses aided differ in purposes and operation. When the natural and probable consequences doctrine operates, the aider-abetter's responsibility necessarily extends to other offenses than the target offense that has been abetted, potentially with other mental state requirements. On the other hand, the law requires full proof that those other offenses have been committed, just as the instructions here defined and required a murder that included malice. Hence, unlike a felony-murder defendant, an aider-abetter of felonious assault is not exposed to conviction of murder without proof of malice on the part of the principal. But natural and probable consequences liability is a form of derivative liability, imposed on the aider-abetter by reason of his or her joining in the target crime, just as it is also imposed on members of a conspiracy who join to effectuate such a crime. [¶] We therefore reject [petitioner's] contention that the felony-murder "merger" doctrine applies to and restricts aider-abetter liability for a murder that is a natural and probable consequence of a felonious assault.[FN12] Moreover, we also find unpersuasive [petitioner's] coordinate contention that the instruction permitting such liability unconstitutionally deprived him of a jury determination of the presence of malice. The instruction was not erroneous.

[FN12] We note, moreover, that there are other bases on which the jury's verdict in this case may have rested, including that the murder was a natural and probable consequence of a shooting at an inhabited dwelling, in violation of section 246. That felony has been held to provide a basis for

felony murder liability with imputed malice, not subject to the "merger" doctrine.

Motion, Exh. B at 12–14 (some citations omitted).

The Sixth and Fourteenth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of the crime with which he is charged, beyond a reasonable doubt[,]" *United States v. Gaudin,* 515 U.S. 506, 509–10, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995); *see also In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."), and "[j]ury instructions relieving States of this burden violate a defendant's due process rights." *Carella v. California,* 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989) (per curiam); *see also Evanchyk v. Stewart,* 340 F.3d 933, 939 (9th Cir.2003) ("It is a violation of due process for a jury instruction to omit an element of the crime."), *cert. denied,* 541 U.S. 1067, 124 S.Ct. 2399, 158 L.Ed.2d 971 (2004).

Here, as the California Court of Appeal specifically found, the trial court properly instructed the jury with CALJIC no. 3.02, as a correct statement of California law on aiding and abetting, and the Court cannot second guess that determination. *See Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law ques-

tions."). "Because the trial court's instruction on the natural and probable consequences doctrine was a correct statement of law," petitioner is not entitled to habeas relief on his claim. *Spivey,* 194 F.3d at 976–7; *see also Windham,* 163 F.3d at 1104 ("The jury was properly instructed that if it was persuaded beyond a reasonable doubt that [petitioner] was guilty as an aider and abettor of the contemplated felonious assaults that were committed against members of a rival gang, he would also be liable for the natural and probable consequences of those acts. **The trial court did not err in reading CALJIC 3.02 to the jury.**" (emphasis added)).

Therefore, the California Supreme Court's denial of Ground Six was neither contrary to, nor an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1).

## IX

To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must demonstrate his attorney's performance was deficient and the deficient performance prejudiced him. *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The petitioner bears the burden of establishing both components. *Williams v. Taylor,* 529 U.S. 362, 390–1, 120 S.Ct. 1495, 1511–2, 146 L.Ed.2d 389 (2000); *Smith v. Robbins,* 528 U.S. 259, 285–86, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000). "Deficient performance is performance which is objectively unreasonable under prevailing professional norms." *Hughes v. Borg,* 898 F.2d 695, 702 (9th Cir.1990) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064). Prejudice "focuses on the question whether counsel's deficient performance renders

the results of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17.

To establish deficient performance, the petitioner must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Williams,* 529 U.S. at 391, 120 S.Ct. at 1511. In reviewing trial counsel's performance, however, the Court will "strongly presume[ ] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003). Only if counsel's acts and omissions, examined within the context of all the surrounding circumstances, were outside the "wide range" of professionally competent assistance, will petitioner meet this initial burden. *Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986); *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2068.

If petitioner makes this showing, he must then establish there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Rompilla,* 545 U.S. at 390, 125 S.Ct. at 2467. The errors must not merely undermine confidence in the outcome of the trial, but must result in a proceeding that was fundamentally unfair. *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17; *Lockhart,* 506 U.S. at 369, 113 S.Ct. at 842–43. However, the Court need not determine whether counsel's performance was deficient before determining whether

the defendant suffered prejudice as the result of the alleged deficiencies. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); *Robbins,* 528 U.S. at 286 n. 14, 120 S.Ct. at 764 n. 14 (same).

■■■■■■■ The standards for determining whether trial counsel was ineffective apply equally to determining whether appellate counsel was ineffective, *Robbins,* 528 U.S. at 285, 289, 120 S.Ct. at 764, 766; *Cockett v. Ray,* 333 F.3d 938, 944 (9th Cir.2003), and petitioner bears the burden of establishing both components of the *Strickland* standard, i.e., "that counsel's advice fell below an objective standard of reasonableness, ... and that there is a reasonable probability that, but for counsel's unprofessional errors, [the petitioner] would have prevailed on appeal." *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989); *Cockett,* 333 F.3d at 944. In reviewing appellate counsel's performance, the Court will presume appellate counsel used reasonable tactics; otherwise, it "could dampen the ardor and impair [counsel's] independence ..., discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Pollard v. White,* 119 F.3d 1430, 1435 (9th Cir.1997) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065). Appellate counsel has no constitutional duty to raise every issue, where, in the attorney's judgment, the issue has little or no likelihood of success. *McCoy v. Court of Appeals of Wisconsin,* 486 U.S. 429, 436, 108 S.Ct. 1895, 1900, 100 L.Ed.2d 440 (1988).

■■■■■ In Ground One, petitioner claims he received ineffective assistance of trial counsel, who: (a) "did not present petitioner with discovery evidence (transcripts of all witness interviews with police)"; (b) "advised petitioner to invoke his 5th

Amendment right to remain silent while being accused of acts petitioner wasn't even [a] witness to"; (c) "neglected to effectively cross-examine the descriptive testimony of prosecution witness Jessica Barahona and failed to raise questions requested by petitioner"; and (d) "ineffectively concurred to a 4–year firearm use enhancement that should have been objected to during the sentencing of petitioner[,]" [29] and petitioner also claims appellate counsel was ineffective for failing to raise these arguments on appeal. In Ground Two, petitioner claims "trial counsel failed to develop and present the defense of petitioner's claim[ ] of actual innocence."

The Los Angeles County Superior Court rejected these claims, stating:

> As to the claims of ineffective trial counsel and appellate counsel, petitioner claims counsel was ineffective for failing to investigate, develop and properly present a potentially meritorious defense of actual innocence. As to the claims of actual innocence and allegations that the trail [sic] and appellate counsel did not investigate, develop and properly present the case, the petition contains only vague conclusory allegations. Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief. Petitioner claims that his attorney advised him not to testify and that the primary witness against him, Jessica Barahona, was treated by police using suggestive procedures and was not credible. There is no evidence in the record or provided by petitioner of improper police conduct. Credibility was an issue for the jury. A suggestion to a client of whether or not to testify is a matter of trial tactics. Petitioner fails to show the existence of an issue which has a reasonable potential for success in support of his claim of ineffective assistance of trial counsel or appellate counsel. There is nothing in the petition or in the record which casts doubt on the accuracy or reliability of the trial proceedings and the petitioner cannot show a fundamental miscarriage of justice occurred. The petitioner did not provide any reasonably available documentary evidence in support of his claim.

Motion, Exh. E at 125–26 (citations omitted).

Here, petitioner has provided absolutely no evidence supporting any of his ineffective assistance of counsel claims. For instance, in subclaim (c), petitioner claims his trial counsel did not effectively cross-examine Barahona because he did not "interview a number of leads" petitioner gave him and did not present a defense of actual innocence. Yet, petitioner has not identified these "leads" and has not explained what these "leads" would have disclosed and how that would have altered the cross-examination of Barahona and the outcome of the trial. *United States v. Berry,* 814 F.2d 1406, 1409 (9th Cir.1987); *United States v. Schaflander,* 743 F.2d 714, 721 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Further, the petitioner must show that the witness was actually available and willing to testify. *United States v. Harden,* 846 F.2d 1229, 1231–32 (9th Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988). Generally, these requirements are satisfied by an affidavit or declaration from the witness. Here, petitioner has not identified any witness who would have supported a defense of actual innocence, let alone provided any evidentiary support

---

**29.** Since the California Court of Appeal struck this enhancement, as discussed above, petitioner could not have been prejudiced by trial counsel's failure to object to it. *Williams,* 529 U.S. at 391, 120 S.Ct. at 1511–12; *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

demonstrating such witness was available and willing to testify. *See Bragg v. Galaza,* 242 F.3d 1082, 1088 (9th Cir.2001) (mere speculation that witness might have given helpful information if interviewed is not enough to establish ineffective assistance), *as amended,* 253 F.3d 1150 (9th Cir.2001); *Dows v. Wood,* 211 F.3d 480, 486 (9th Cir.), *cert. denied,* 531 U.S. 908, 121 S.Ct. 254, 148 L.Ed.2d 183 (2000) (rejecting claim of ineffective assistance for failure to call witness based upon lack of affidavit from witness regarding substance of testimony); *Berry,* 814 F.2d at 1409 (petitioner's ineffective assistance of counsel claim based on the failure to call witnesses was "meritless" when petitioner "offer[ed] no indication of what these witnesses would have testified to, or how their testimony might have changed the outcome of the hearing").

Similarly, petitioner fails to explain what questions he asked his trial counsel to ask Barahona, or how he was in any manner prejudiced by the failure of his attorney to ask such questions. Likewise, petitioner does not explain how he was injured because his trial counsel did not provide him with the transcripts of all police witness interviews. In short, petitioner's "conclusory suggestions that his trial and state appellate counsel provided ineffective assistance fall far short of stating a valid claim of constitutional violation." *Jones v. Gomez,* 66 F.3d 199, 205 (9th Cir.1995), *cert. denied,* 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996); *James v. Borg,* 24 F.3d 20, 26 (9th Cir.), *cert. denied,* 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); *see also Sandgathe v. Maass,* 314 F.3d 371, 379 (9th Cir.2002) (affirming denial of ineffective assistance of counsel claim when petitioner presented no evidence supporting claim).

Accordingly, the California Supreme Court's denial of Grounds One and Two was neither contrary to, nor an unreasonable application of, clearly established federal law.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.

DATE: Sept. 3, 2008.